#27877-a-JMK

2017 S.D. 20

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOSHUA THOMAS SPANIOL,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. SPEARS
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                        and appellee.


TERRY J. SUTTON of
SUTTON LAW OFFICES, P.C.
Watertown, South Dakota                   Attorneys for defendant
                                        and appellant.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 13, 2017
OPINION FILED 05/03/17

#27877

KERN, Justice

[¶1.]     A jury convicted Joshua Spaniol of three counts of first-degree rape and one count of sexual contact with a child under sixteen years of age. Spaniol appeals, alleging the circuit court erred by finding the child competent to testify at trial. After the child testified on direct examination, Spaniol contends the child became unavailable because of her poor memory, depriving him of cross-examination as required by the Confrontation Clause. He further contends the circuit court erred by denying his pretrial motion to suppress his own statements to law enforcement and by giving Instruction 11 to the jury. We affirm.

## BACKGROUND

[¶2.]     In early October 2014, H.S. (Mother) noticed her four-year-old daughter, A.S., had a brown vaginal discharge. On October 6, Mother took A.S. to see Doctor Rebecca Pengilly. Dr. Pengilly took a sample and sent it to a lab for testing, expecting results in several days.

[¶3.]     On October 7, Joshua Spaniol, Mother's husband and A.S.'s father, told Mother that his penis was painful, inflamed, and he had a discharge. Spaniol went to a clinic and saw Doctor Daniel Reifenberger on October 8. Because Spaniol reported that he was in a monogamous sexual relationship, Dr. Reifenberger did not check him for sexually transmitted diseases. Instead, he took a urine sample to determine if Spaniol had a urinary tract infection. Pending the test results, Dr. Reifenberger gave Spaniol a prescription for Cipro, an antibiotic, to be taken twice a day for ten days. The test results revealed that Spaniol did not have a urinary tract infection, although some type of an infection, sexually transmitted or otherwise,

-1-

was present. Spaniol later tested negative for gonorrhea but only after he had taken 10 doses of Cipro in the days preceding the test. Cipro is recognized as being potentially effective in treating gonorrhea.

[¶4.]    By October 9, A.S.'s discharge worsened, and Mother took her to the emergency room at a local hospital. Medical staff suspected a venereal disease and alerted Child Protective Services (CPS) and the Watertown Police Department (PD) of A.S.'s condition. Detective Ahmann responded and interviewed Mother at the hospital. He called Spaniol at about 3:30 p.m. and asked him to come to the police station for an interview. Spaniol drove himself to the station and spoke with Detective Ahmann. The interview was brief and cordial, and Detective Ahmann asked about A.S.'s symptoms and the family. Spaniol offered that he and A.S. bathed together and that he had a genital rash but not a discharge like A.S. He left the police station after the interview ended.

[¶5.]    On October 10, A.S.'s test results revealed she had gonorrhea. Dr. Pengilly informed Detective Stahl and CPS of the results. When Detective Stahl learned that A.S. tested positive for gonorrhea, he wrongly presumed that Spaniol had also tested positive for the disease. He then called Mother and requested that she and Spaniol come to the police station for interviews. They agreed and drove to the police station together. Law enforcement interviewed Spaniol, and he made numerous admissions, which resulted in his arrest at the end of the interview.

[¶6.]    On October 13, Mother took A.S. for an interview at Child's Voice, an advocacy center in Sioux Falls, South Dakota, for children who may have been abused. A.S. participated in a recorded interview with forensic interviewer Robyn

Niewenhuis. A.S. told Niewenhuis that her dad hurt her on more than one occasion, and when asked where, she pointed to her vaginal area. She stated that her dad used his finger, and when asked where his finger would go, she stated right in her body, pointing to her vaginal area. A.S. is diagnosed with autism spectrum disorder, which limits her ability to communicate.

[¶7.] On November 14, 2014, a Codington County Grand Jury indicted Spaniol on four counts of rape in the first degree in violation of SDCL 22-22-1(1) and one count of sexual contact with a child under sixteen years of age in violation of SDCL 22-22-7.

[¶8.] Spaniol filed several pretrial motions. On January 14, 2015, Spaniol filed a motion to suppress the statements he made to law enforcement on October 10, 2014. After a hearing, the circuit court issued findings of fact and conclusions of law, denying Spaniol's motion. On October 15, 2015, Spaniol filed a motion to determine A.S.'s competency to testify at trial. At the time the motion was filed, A.S. was five years old, and Spaniol alleged that because of her age and autism diagnosis, she could be difficult to understand as her speech was delayed. The circuit court held a hearing on A.S.'s competency on October 21, 2015, at which A.S. testified. On January 5, 2016, the circuit court issued findings of fact and conclusions of law, holding that A.S. was competent to testify. Specifically, the circuit court found that "[a]lthough A.S. has several developmental delays and limitations in her ability to communicate, A.S. has sufficient mental capacity to observe and recollect, A.S. has an ability to communicate, and A.S. has some sense of moral responsibility."

[¶9.] Spaniol's case proceeded to a jury trial from February 29 through March 3, 2016. During the trial, the State introduced into evidence the recording of A.S.'s interview at Child's Voice and the Forensic Interview Summary. Additionally, A.S., who was six at the time of trial, testified that her "daddy hurt [her] potty" with his hand. A.S. was then subject to cross-examination. Due to some of A.S.'s responses, Spaniol's attorney asked the circuit court to declare A.S. unavailable for cross-examination because of her lack of memory. The circuit court denied this motion. At the close of the State's case, Spaniol's attorney moved to dismiss Count IV of the indictment, one of the first-degree rape charges, which the circuit court granted. During the settlement of the jury instructions, Spaniol's attorney objected to Instruction 11, which defined sexual penetration. The circuit court overruled the objection and gave the instruction to the jury.

[¶10.] On March 3, 2016, the jury convicted Spaniol on the four remaining counts in the indictment. On May 18, 2016, the court sentenced Spaniol to three consecutive twenty-year sentences for the first-degree rape convictions and to a ten-year sentence for the sexual contact conviction to be served concurrently.

[¶11.] Spaniol appeals his conviction, raising four issues:

1. Whether the circuit court abused its discretion by finding A.S. competent to testify.

2. Whether the circuit court's denial of Spaniol's motion to have A.S. declared unavailable for the purposes of cross-examination violated his Sixth Amendment right to confrontation.

3. Whether the circuit court erred in refusing to suppress Spaniol's statements to law enforcement.

4.     Whether the circuit court erred by giving jury Instruction 11.

## DECISION

1.     *Whether the circuit court abused its discretion by finding A.S. competent to testify.*

[¶12.]     A circuit court's decision to find a witness competent to testify "will only be reversed upon a showing of an abuse of discretion." *State v. Carothers* (*Carothers II*), 2006 S.D. 100, ¶ 11, 724 N.W.2d 610, 616. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850 (quoting *Arneson v. Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 910).

[¶13.]     "Every person is competent to be a witness unless otherwise provided in this chapter." SDCL 19-19-601. "There is no general rule regarding a child's inherent reliability nor is there any arbitrary age at which a child is deemed competent to testify." *Carothers II*, 2006 S.D. 100, ¶ 12, 724 N.W.2d at 616. "Instead, the standard for determining whether a child is competent to testify is whether she or he has 'sufficient mental capacity to observe, recollect, and communicate, and some sense of moral responsibility.'" *Id.* (quoting *State v. Anderson*, 2000 S.D. 45, ¶ 23, 608 N.W.2d 644, 653). We have said that it is "[o]ur preference to allow the child to testify in order for the jury to evaluate the child's credibility." *State v. Guthmiller*, 2003 S.D. 83, ¶ 11, 667 N.W.2d 295, 301; *see Anderson*, 2000 S.D. 45, ¶ 30, 608 N.W.2d at 654.

[¶14.]     Spaniol argues that A.S.'s short responses combined with her young age and developmental delays rendered her incompetent to testify. He reaches this conclusion by pointing to A.S.'s answers to questions asked at the competency hearing, which he contends were mostly one-word responses to the State's leading questions. A.S. also answered many questions with head nods or "I don't know."

[¶15.]     At the time of the competency hearing, A.S. was five years and eight months old. In addition to the child's testimony, the circuit court admitted and reviewed a number of exhibits, including the video of A.S.'s interview at Child's Voice, medical progress notes, psychological and occupational therapy evaluations, and a multidisciplinary evaluation report from the school. The circuit court noted the medical records showed A.S. suffered from autism spectrum disorder, obsessive compulsive disorder, and an anxiety disorder. The circuit court acknowledged that these disorders limited A.S.'s ability to communicate at the hearing but concluded that A.S. was competent to testify at trial.

[¶16.]     It is evident that A.S. had moments that may be indicative of suggestibility or confusion. For example, near the end of the competency hearing, the following exchange occurred on cross-examination:

> **Q**: You said that you had a dad, Josh; do you see him today?
> **A**: No.
> **Q**: You don't see him at all; do you?
> **A**: (Inaudible.)
> **Q**: He is not here today; is he?
> **A**: (Inaudible.) Where is he?
> **Q**: And is that the truth or a lie?
> **A**: The truth.
> **Q**: The truth?

**A**: (Witness nods head.)  (Inaudible.)

**Q**: You don't recall your dad living with you either; do you?

**A**: Nope.

**Q**: And you don't recall being in a bathtub with your dad; do you?

**A**: No.

**Q**: And that's the truth, isn't it?  You have to answer out loud. We are making a record, taking down what you said.

**A**: Yeah.

Not only did A.S. indicate her father was not present, but she also contradicted an earlier statement made on direct examination that she previously lived with her father.  Yet on redirect by the State, she identified her father in the following exchange:

**Q**: [A.S.], when the other attorney asked you some questions about your dad, you kept looking over that way at the guy in the blue shirt.  Do you know who that is?  Who is sitting over there in the blue shirt?  You don't know?

**A**: Probably my dad.

**Q**: Yeah.

**A**: Do you know if it's your dad?

**A**: (Witness [n]ods head.)

**Q**: Are you nodding yes you know it's your dad?

**A**: (Witness nods head.)  Yeah.  I thought he was over there, (inaudible) sit over there today.

Likewise, on recross, she again identified her father, stating "[y]eah, that was my dad.  I saw him in blue shirt and, yup, it is my dad."

[¶17.]      Upon review of the entire transcript, it is apparent that A.S. had an imperfect memory and made contradictory statements.  But the record also reveals that she possessed the ability to observe, recollect facts from her life, and to communicate.  A.S. was able to identify her parents; her brother

and her relation to him; her age and date of birth; that she attended kindergarten and the name of her school; the names of several friends from school; and she was able to name the number of fingers being held up by the prosecutor on direct examination. Further, the State's use of leading questions and A.S.'s responses do not undermine the circuit court's decision because "'[i]t is settled law that permitting the use of leading questions is within the discretion of the trial court. This is a broad discretion when the witness is a young person.'" *State v. Weisenstein*, 367 N.W.2d 201, 205 (S.D. 1985) (quoting *State v. Brown*, 285 N.W.2d 843, 845 (S.D. 1979)). Indeed, the circuit court indicated it would give "both sides leeway" during the examination of the child.

[¶18.] Additionally, A.S. showed a sufficient sense of moral responsibility by distinguishing truth from falsehood several times during her testimony. On direct examination, the State and A.S. had the following exchange:

> **Q**: Okay. A.S. do you know the difference between a truth and a lie?
>
> **A**: (Witness nods head.)
>
> **Q**: Do you? Are you nodding yes that you know that?
>
> **A**: (Witness nods head.)
>
> **Q**: You do know what the difference is? Okay. We'll pick something. What color is your shirt, this shirt?
>
> **A**: Pink.
>
> **Q**: It's pink. Okay. If I said that your shirt was blue, would that be the truth or a lie?
>
> **A**: A lie.
>
> **Q**: Okay. Is it good to tell lies?
>
> **A**: (Witness shakes head no.)
>
> **Q**: You are shaking your head no?

**A**: Yup. (Inaudible.)

On cross-examination, defense counsel asked A.S. the following:

> **Q**: All right. If I told you it's raining outside right now, would that be a truth or a lie?
>
> **A**: A lie.
>
> **Q**: Okay. If I told you my tie was green?
>
> **A**: That would be a lie.

A.S. said she knew the difference between a truth and a lie and correctly applied the distinction while testifying. She also had "'some sense of moral responsibility,'" acknowledging that it was not good to lie. *Carothers II*, 2006 S.D. 100, ¶ 12, 724 N.W.2d at 616 (quoting *Anderson*, 2000 S.D. 45, ¶ 23, 608 N.W.2d at 653).

[¶19.] "[A] decision upon the competency of a child to testify is one peculiarly within the discretion of the trial judge because the evidence of intelligence, ability to recall, relate and to appreciate the nature and obligations of an oath are not fully portrayed by a bare record." *Garrard v. State,* 335 So.2d 603, 603-04 (Fla. Dist. Ct. App. 1976), *cert. denied*, 342 So.2d 1101 (Fla. 1977). For these reasons, the trial court is "vested with wide discretion in determining competency and on appeal, its ruling is accorded great weight[.]" *Anderson*, 2000 S.D. 45, ¶ 23, 608 N.W.2d at 653 (citing *State v. Pace*, 301 So.2d 323, 325 (La. 1974)). Based upon our review of the record, the circuit court did not abuse its discretion when it found A.S. competent to testify.

> 2. *Whether the circuit court's denial of Spaniol's motion to have A.S. declared unavailable for the purposes of cross-examination violated his Sixth Amendment right to confrontation.*

[¶20.]     Spaniol makes two arguments in support of his contention the circuit court erred in denying his request to deem A.S. unavailable as a witness. First, he contends A.S.'s "interview with Child's voice (Exhibit 12) and the Forensic Interview (Exhibit 11) should not have been admitted" because "she could not answer any questions about her prior testimony at Child's voice or at the competency hearing." Second, he claims that he was denied the ability to effectively cross-examine A.S. in violation of the Sixth Amendment.

[¶21.]     Spaniol's first claim of error regarding Exhibits 11 and 12 is waived because he did not object to the admission of the exhibits at trial. *See Bakker v. Irvine*, 519 N.W.2d 41, 46-47 (S.D. 1994); SDCL 19-19-103(a). However, we "may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved." SDCL 19-19-103(e). But Spaniol does not argue plain error on appeal. "In exercising our appellate function, it is elemental that we should limit our review to the arguments that are raised and briefed." *State v. Mulligan*, 2007 S.D. 67, ¶ 25, 736 N.W.2d 808, 818. Thus, we decline to address whether the circuit court committed plain error.

[¶22.]     Spaniol did, however, preserve his broader Sixth Amendment challenge to the circuit court's refusal to declare A.S. unavailable during her cross-examination at trial. Spaniol alleged that A.S., although physically present, was effectively unavailable for cross-examination because of her lack of memory. Accordingly, Spaniol argues that his alleged inability to cross-examine A.S. violated his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In response, the State contends that Spaniol had the opportunity

#27877

for an effective cross-examination, but his questions and manner of examination at trial were confusing and impaired A.S.'s ability to answer.

[¶23.] We generally "review evidentiary rulings for abuse of discretion." *State v. Crawford*, 2007 S.D. 20, ¶ 13, 729 N.W.2d 346, 349. However, the issue here—whether Spaniol's Sixth Amendment right to confrontation was violated—is a constitutional question, which we review de novo. *State v. Carothers* (*Carothers I*), 2005 S.D. 16, ¶ 7, 692 N.W.2d 544, 546; *see also State v. Ball*, 2004 S.D. 9, ¶ 16, 675 N.W.2d 197-98 (stating that a motion normally reviewed under an abuse of discretion standard is instead reviewed do novo when the "sole issue" is whether a constitutional violation occurred).

[¶24.] The Confrontation Clause of the Sixth Amendment to the United States Constitution, as applied to South Dakota through the Fourteenth Amendment, requires that in all criminal cases, the defendant has the right "to be confronted with the witnesses against him." *See also Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. Davis*, 401 N.W.2d 721, 724 (S.D. 1987). The Confrontation Clause applies to witnesses testifying at trial and to the admission of hearsay. *Carothers II*, 2006 S.D. 100, ¶ 16, 724 N.W.2d at 617. "This right is 'generally satisfied when the defense is given a full and fair opportunity to probe and expose a witness' infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'" *Id.* (quoting *United States v. Owens*, 484 U.S. 554, 558, 108 S. Ct. 838, 841, 98 L. Ed. 2d 951 (1988)). "However, when the witness is a young child, there are additional concerns in satisfying the

Confrontation Clause because the child may simply be 'too young and too frightened to be subjected to a thorough direct or cross-examination' as envisioned by the Constitution." *Id.* (quoting *United States v. Spotted War Bonnet*, 933 F.2d 1471, 1474 (8th Cir. 1991) (internal quotations omitted)).

[¶25.] During A.S.'s cross-examination, Spaniol's counsel attempted to impeach A.S. using her prior testimony from the pretrial competency hearing. Towards the end of this portion of the examination, the following colloquy occurred:

> Q: Okay. Before, before the individual and I went up and talked to the Judge, the man who is seated beside you with the black robe, I asked you whether you remember when you were in the princess chair last time, whether you were asked the question you said you told your mom that somebody hurt you; now do you remember being asked that question when you were in the princess chair last time you were in the princess chair? You don't remember?
>
> A: No.
>
> Q: Do you remember that you answered that question by saying, yeah? Do you remember that, when you were in the princess chair last time?
>
> A: Maybe
>
> Q: But you don't remember it today, right, whether you said that?
>
> A: Yeah, I don't know it today.
>
> Q: Okay. Do you remember when you were in the princess chair last time you were asked the question, that wasn't your dad, was it? That was immediately asked after the questions we've just asked. Do you remember being asked that question when you were in the princess chair the last time? Do you remember that?
>
> A: No, can't remember it.
>
> Q: And do you remember that you answered that question when you were in the princess chair last time, you said nope? Do you remember that? You don't remember, that's okay.
>
> A: Nope, I can't remember it.

**Q**: Do you remember when you were in the princess chair the last time as well you were asked a question and there is a little bit of words first, okay, because I asked another question, the words first were listen, well, no, listen to my question, listen to what I'm asking you. It wasn't your dad that hurted you; was it? Do you remember you were asked that question? Do you remember that you were asked that question?

**A**: No.

**Q**: Do you remember when you were in the princess chair last time you were asked that question and you shook your head, which means, no? Do you remember that?

**A**: Can't remember it. Losing my mind.

[¶26.] After this testimony, Spaniol's attorney asked for a recess. In chambers, counsel asked the circuit court to declare A.S. unavailable for purposes of cross-examination. If declared unavailable, counsel sought permission to introduce A.S.'s testimony from the competency hearing in his case-in-chief by having a reader play the role of A.S. and give A.S.'s answers from the witness stand in response to the questions. Although A.S. did express some confusion and could not remember certain facts, the circuit court denied the motion to find A.S. unavailable. The circuit court stated that in its "opinion what we have here is a child witness with developmental disabilities who is confused by the formation of [defense counsel's] questions." To resolve the matter, the circuit court allowed Spaniol's counsel to read the prior questions from the competency hearing transcript to the child verbatim and ask her if she recalled the question and her answers. A.S. could not remember the answers she gave to the questions at the prior hearing.[1]

---

1. For example, after the recess, A.S. was asked this question about her prior testimony:

(continued . . .)

[¶27.] At the conclusion of A.S.'s testimony, Spaniol's attorney renewed his motion to have A.S. declared unavailable. He argued that because the child could not remember the prior questions and answers, he was unable to establish the inconsistency for impeachment purposes. He again requested that the specific questions and answers previously given be read to the jury using a reader to play the part of A.S. The State objected. The parties eventually stipulated that Spaniol could read several of A.S.'s prior questions and answers to the jury at the close of Spaniol's case-in-chief. Further, the parties agreed the jury would be advised the statements could be considered as prior inconsistent statements made by A.S. under oath at a prior proceeding.[2] Additionally, the circuit court gave the jury an

_____

(. . . continued)

> **Q**: But you don't remember previously talking, testifying when you, let me ask you this, you don't remember previously saying from the witness chair when you were asked, you said you told your mom that somebody hurt you, you said, yeah, and then you said, you were asked the question, that wasn't your dad; was it? And you said no. You don't remember that; do you?
>
> **A**: No.

2. Defense counsel read this statement to the jury:

> The following pursuant to stipulation of the party may be considered as prior inconsistent statements of [A.S.]: [A.S.] in a previous proceeding was asked the question, you said that you had a dad, Josh. Do you see him today? And [A.S.'s] answer was no.
>
> And then [A.S.] was asked the question, you don't recall your dad living with you either; do you? To which [A.S.] answered, no. And [A.S.] was asked the question, and you don't recall being in a bathtub with your dad; do you? To which [A.S.] answered, no.
>
> And then the following statements as well may be considered by the jury as prior inconsistent statements: [A.S.] was asked the question, you said you told your mom that somebody hurt you? To which [A.S.] answered, yeah. And [A.S.] was then asked the question, that wasn't your dad; was it? To which [A.S.] answered, nope. And with

(continued . . .)

#27877

instruction regarding the proper manner in which to evaluate prior inconsistent statements.

[¶28.]    Initially, it is worth noting that the questions Spaniol's attorney asked A.S. would be difficult for an adult witness to decipher, much less a six-year-old child with autism.  The questions were lengthy, complex, and compound.  Further, the stop-and-start nature of these questions strongly suggests that the form of Spaniol's attorney's questions were confusing to the witness.

[¶29.]    "An individual is only guaranteed 'an *opportunity for effective* cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Milstead v. Smith*, 2016 S.D. 55, ¶ 13, 883 N.W.2d 711, 717 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 53, 107 S. Ct. 989, 999, 94 L. Ed. 2d 40 (1987)).  Spaniol had an *opportunity* to effectively cross-examine A.S.  At trial, A.S. was unable to provide as much detail as she did in the interview at Child's Voice.  But she did testify on direct examination that her "daddy hurted her potty," and on cross-examination, when asked, "[y]our daddy didn't hurt you did he?" she responded "[y]eah, he did."  And again, when asked, "[h]e didn't hurt you with his potty did he?" she responded, "[y]eah, he did."  These statements were contradicted by other testimony and impeached by A.S.'s prior statements.  Additionally, Spaniol's attorney repeatedly got A.S. to admit to a lack of memory or that certain events never happened.  A.S.'s testimony and the

_____

(. . . continued)

those, [A.S.] was also asked the following question: It wasn't your dad that hurted you; was it?  And [A.S.] did not answer verbally, but shook her head to which the response was indicating no.

-15-

rigorous cross-examination allowed "the jury to evaluate the child's credibility." *Guthmiller*, 2003 S.D. 83, ¶ 11, 667 N.W.2d at 301.

[¶30.]    A.S.'s partial lapses in memory are not constitutionally fatal because the right to "confrontation 'includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.'" *State v. Toohey*, 2012 S.D. 51, ¶ 15, 816 N.W.2d 120, 128 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 21-22, 106 S. Ct. 292, 295, 88 L. Ed. 2d 15 (1985)); *see also Carothers II*, 2006 S.D. 100, ¶ 18, 724 N.W.2d at 618 (holding that a child witness was available even though "she may not have been able to repeat exactly what she told" doctors and law enforcement because "she did remember speaking to them and telling . . . 'the truth'").

[¶31.]    In *State v. Toohey*, we held that a child witness who struggled to answer questions on cross-examination was sufficiently available to satisfy the Confrontation Clause. 2012 S.D. 51, ¶ 18, 816 N.W.2d at 129. In so holding, we made the following observation about the United States Supreme Court's interpretation of the Confrontation Clause in *Crawford v. Washington*:

> The *Crawford* decision spoke in almost categorical terms: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior statements." Several courts have taken this to mean that even a witness with no memory of the events in question is nevertheless present and available for cross-examination under *Crawford*.

*Id.* ¶ 16, 816 N.W.2d at 128 (listing courts interpreting *Crawford* as such) (quoting *Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9). Thus, the mere fact that A.S. appeared at trial and listened to defense counsel's questions suggests that the

Confrontation Clause does not bar her statements, despite her inability to perfectly recollect the past. But like the child witness in *Toohey*, A.S. "did more than simply appear in court." *Id.* ¶ 17. During cross-examination, A.S. recalled the past and spoke about specific events and places. Although A.S.'s memory and communication were imperfect, they were not constitutionally deficient.

[¶32.]    Because A.S. was available for cross-examination, Spaniol's Sixth Amendment right to confrontation was not violated.

> 3.    *Whether the circuit court erred in refusing to suppress Spaniol's statements to law enforcement.*

[¶33.]    Spaniol contends that the circuit court erred in denying his motion to suppress the statements he made to law enforcement on October 10, 2014. Spaniol argues that each segment of the October 10 interview was custodial and the police erred by not advising him of his *Miranda* rights at the beginning of the interview. Officers read Spaniol the *Miranda* warnings during the final portion of the interview but only after he made numerous incriminating statements. As a further ground for suppression, Spaniol claims that due to police coercion, "his will was overborne and his statements were not voluntary" in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[¶34.]    "We review a circuit court's factual determination regarding the circumstances surrounding the interrogation 'under the clearly erroneous standard.'" *State v. Deal*, 2015 S.D. 51, ¶ 14, 866 N.W.2d 141, 146 (quoting *State v. Bowker*, 2008 S.D. 61, ¶ 27, 754 N.W.2d 56, 65). But the legal determination— whether a *Miranda* violation occurred—is "'a question of law' reviewed de novo." *Id.* (quoting *Bowker*, 2008 S.D. 61, ¶ 27, 754 N.W.2d at 65).

[¶35.]      "'The Fifth Amendment right against self-incrimination is implicated whenever an individual is subject to custodial interrogation by law enforcement.'" *State v. Walth*, 2011 S.D. 77, ¶ 10, 806 N.W.2d 623, 625 (quoting *Bowker*, 2008 S.D. 61, ¶ 26, 754 N.W.2d at 64). "An individual is subject to custodial interrogation if he is 'deprived of his freedom of action in any significant way.'" *Id.* (quoting *State v. Hamm*, 89 S.D. 507, 514, 234 N.W.2d 60, 64 (1975)). To determine whether such deprivation requiring a *Miranda* warning has occurred, we use "[a] two-part test . . . to determine whether an individual is in custody at the time of questioning":

> First, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Id.* ¶ 12, 806 N.W.2d at 626 (quoting *State v. Wright*, 2009 S.D. 51, ¶ 19, 768 N.W.2d 512, 520). Like the Confrontation Clause, this right applies to South Dakota through the Fourteenth Amendment. *See State v. Connors*, 149 N.W.2d 65, 68 (S.D. 1967).

[¶36.]      The facts as found by the circuit court reveal that on October 10, 2014, Sergeant Stahl called Mother shortly before 6 p.m., requesting she and Spaniol come to the Watertown Police Department for further interviews. Spaniol and Mother drove to the police station, arriving at about 6:10 p.m. Upon arrival, police officers escorted them to separate interview rooms. Spaniol's room was "small, cramped, and austere in nature." In the hallway before entering the room, police

officers told Spaniol that he was not under arrest and not in custody. Sergeant Stahl and Special Agent (SA) Corey from the Division of Criminal Investigation (DCI) interviewed Spaniol three times over the next two hours.

[¶37.] Sergeant Stahl conducted the first segment of the interview, which lasted about thirty minutes. He did not read Spaniol the *Miranda* warnings. Sergeant Stahl asked Spaniol why he thought he was called down for a second interview. Spaniol speculated that it was because he previously bathed with A.S. He eventually admitted to contact between his penis and A.S.'s vagina while they were bathing, but he insisted it was accidental. Sergeant Stahl ended the interview, and Spaniol sat alone for several minutes.

[¶38.] SA Corey then entered and began the second segment of the interview, which lasted about nineteen minutes. SA Corey started by introducing himself to Spaniol and telling him that he wanted to discuss certain things he said to Sergeant Stahl. He first asked Spaniol if Sergeant Stahl had treated him okay and with respect. Spaniol responded "yes." SA Corey then confirmed that prior to beginning the interview, while walking down the hallway to the interview room, Spaniol was told he was not under arrest and not in custody. SA Corey also told Spaniol "that the door was closed for privacy and that if at any time he felt uncomfortable, he was free to leave."

[¶39.] Spaniol repeated his story that A.S. slipped in the bathtub while bathing and fell on his "semi-erect penis, causing penetration." SA Corey then accused Spaniol of being dishonest and giving A.S. gonorrhea. SA Corey mistakenly believed that Spaniol had tested positive for gonorrhea. Spaniol eventually

admitted to penetrating A.S. with the tip of his penis on two occasions, "rubbing his penis on the labia of A.S.'s vagina, and placing his penis in her vagina after ejaculating." SA Corey asked if this had happened more than three times and Spaniol responded, "[y]es." SA Corey said that he would tell Sergeant Stahl that he was being honest now and left the interview room.

[¶40.]     Sergeant Stahl reentered the room and asked who should tell Mother what he had done. Spaniol indicated that he would like to tell Mother himself. Sergeant Stahl left the room and about a minute later, Mother entered. Spaniol told her that he had "messed around" with A.S. and rubbed his penis on her. Mother became emotional, and Spaniol became despondent. An officer removed her from the room shortly afterwards, and Spaniol remained in the room alone. Officers brought Spaniol a bottle of water.

[¶41.]     Sergeant Stahl reentered the room about twenty-two minutes later. He read Spaniol his *Miranda* rights from a card. Spaniol initialed the card and indicated that he understood and wished to waive his *Miranda* rights. Spaniol continued to speak with Sergeant Stahl and admitted to penetrating A.S. on four occasions. This final segment of the interview lasted for about twelve minutes. In total, Spaniol was questioned for approximately two hours.

[¶42.]     Now that the scene is set, we apply an objective test to determine whether there was a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Walth*, 2011 S.D. 77, ¶ 12, 806 N.W.2d at 626 (quoting *Wright*, 2009 S.D. 51, ¶ 19, 768 N.W.2d at 520). Spaniol voluntarily came to the police station, and he was told in the hallway before the interview

began that he was not under arrest. "[A] defendant's acceptance of an officer's invitation to go to a police station and speak with the police" does not constitute custodial interrogation. *Id.* ¶ 16, 806 N.W.2d at 626. Although the interview took place behind a closed door in a small room at a police station, this is not dispositive as "'a closed, or even locked door does not, in and of itself, create a custodial interrogation.'" *Id.*, 806 N.W.2d at 626-27 (quoting *State v. Thompson*, 1997 S.D. 15, ¶ 28, 560 N.W.2d 535, 541). Spaniol was also told during the October 9 interview and again on the 10th that the door was shut in the interview rooms for privacy. Meanwhile, the fact that the police questioning on October 10 was more focused and intense than the questioning the day before does not create a custodial environment. "'Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.'" *Id.* ¶ 15, 806 N.W.2d at 626 (quoting *Thompson*, 1997 S.D. 15, ¶ 25, 560 N.W.2d at 540). At least in the first two segments of the interview on October 10, "'there is 'no indication that [Spaniol] was coerced into making any statements through the 'inherently compelling pressures' of a custodial setting.'" *Wright*, 2009 S.D. 51, ¶ 26, 768 N.W.2d at 522 (quoting *State v. Johnson*, 2007 S.D. 86, ¶ 28, 739 N.W.2d 1, 10). Spaniol's freedom of movement was not restrained to the degree associated with a formal arrest. Thus, *Miranda* warnings were not required in either the first or second segments of the interview.

[¶43.] Sergeant Stahl read Spaniol the *Miranda* warnings before the third segment of the interview, and Spaniol waived his *Miranda* rights. The introduction

of *Miranda* warnings after an interview with law enforcement has already commenced raises special concerns about the efficacy of the warnings. Whether Spaniol's waiver was effective depends on "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Missouri v. Seibert*, 542 U.S. 600, 611-12, 124 S. Ct. 2601, 2610, 159 L. Ed. 2d 643 (2004); *see McDonough v. Weber*, 2015 S.D. 1, ¶ 28, 859 N.W.2d 26, 39. In *Seibert*, the Supreme Court of the United States condemned a two-step police tactic where a confession is obtained without *Miranda* warnings in a custodial setting, and then the police give a "midstream recitation of the [*Miranda*] warnings" and go over the same questions to elicit the same answers. *Seibert*, 542 U.S. at 604, 124 S. Ct. at 2605. A "statement repeated after a warning in such circumstances is inadmissible." *Id.*

[¶44.]    But there is nothing in this record to suggest law enforcement willfully employed a "two-phase interview technique" which would render the *Miranda* warnings ineffective. *McDonough*, 2015 S.D. 1, ¶ 28, 859 N.W.2d at 39. Further, simply because Spaniol made incriminating statements in his first two interviews, it does not follow that the *Miranda* warnings and waiver before the third interview were per se ineffective. The "failure to administer [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, [does not] so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 1294, 84 L. Ed. 2d 222 (1985); *see Satter v. Solem*, 434 N.W.2d 725, 728

(S.D. 1989). Because neither of the first two segments of Spaniol's interview were custodial or unduly coercive, Spaniol's waiver of his Fifth Amendment right before the third segment was constitutionally effective.

[¶45.]    Spaniol also alleges that the statements made during his interview were involuntary in violation of the Due Process Clause of the Fourteenth Amendment. Spaniol bases this claim on the fact that the police misled him about having gonorrhea, only read him the *Miranda* warnings an hour and twenty minutes into the interview, and kept the interview room door shut at all times.

[¶46.]    "'Ultimately, the voluntariness of a confession depends on the absence of police overreaching . . . . Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will.'" *State v. Johnson*, 2015 S.D. 7, ¶ 24, 860 N.W.2d 235, 245 (quoting *Wright*, 2009 S.D. 51, ¶ 32, 768 N.W.2d at 524). The State bears the burden to establish that Spaniol's statements were voluntary by a preponderance of the evidence. *Id.* "To determine whether Defendant's will was overborne, we look at multiple factors, including":

> (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Id.* (quoting *State v. Cottier*, 2008 S.D. 79, ¶ 19, 775 N.W.2d 120, 129).

[¶47.]      "Many of the same factors and circumstances [that led] to our determination" that the first two portions of Spaniol's interview were non-custodial "inform our analysis of voluntariness." *Id.* The circuit court found that Spaniol is of at least average intelligence and completed high school and some college. Law enforcement did not use force or threats of force to coerce Spaniol's statements. Sergeant Stahl and SA Corey treated Spaniol with respect, and law enforcement communicated to Spaniol that he was not under arrest and that the door to the interview room was shut for privacy. The interview was relatively short, lasting only two hours, and law enforcement did not deprive Spaniol of food, water, sleep, or other comforts. Finally, the erroneous but apparent good faith use of Spaniol's alleged gonorrhea diagnosis does not render his confessions involuntary because even if it was intentional, "the police may use some psychological tactics in interrogating a suspect." *Id.* From our review of the record, it is apparent that the State met its burden to show by a preponderance of the evidence that all of Spaniol's statements during the interview on October 10, 2014, were voluntary. The circuit court did not err by denying the motion to suppress.

4.      *Whether the circuit court erred by giving jury Instruction 11.*

[¶48.]      Spaniol argues the circuit court erred by overruling his objection to the last sentence of Instruction 11. This instruction, which mirrors Pattern Criminal Instruction 3-3-15, reads:

> "Sexual penetration" means an act, however slight, of sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body.

> Genital penetration does not require proof of vaginal penetration. It includes penetration of the exterior of the labia majora.

Spaniol claims that while "Jury Instruction 11 is a correct statement of law, it places undue emphasis on the form of rape alleged here, based on extra-jurisdictional cases." Pattern Criminal Instruction 3-3-15 cites *State v. Packed* as its basis, which in turn cites several cases from other states for the proposition that slight penetration of the exterior of the labia majora is sufficient for "sexual penetration." 2007 S.D. 75, ¶ 32, 736 N.W.2d 851. Spaniol claims that if the South Dakota Legislature wanted to emphasize that "genital penetration does not require proof of vaginal penetration . . . it could amend" the statutory definition of "sexual penetration" found in SDCL 22-22-2 to include this language. Accordingly, Spaniol believes Instruction 11 prejudiced him by taking the "determination [of what penetration, if any, occurred] out of the jury's hands."

[¶49.]       "'A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.'" *State v. Whistler*, 2014 S.D. 58, ¶ 13, 851 N.W.2d 905, 910 (quoting *State v. Hauge*, 2013 S.D. 26, ¶ 17, 829 N.W.2d 145, 150). "If the trial court finds an issue is competently supported by the record, then the court is justified in giving the instruction." *State v. Aesoph*, 2002 S.D. 71, ¶ 47, 647 N.W.2d 743, 759. Further, for an abuse of discretion "[t]o constitute reversible error, an instruction must be shown to be both erroneous and prejudicial, such that 'in all probability [it] produced some effect upon the verdict and [was] harmful to the substantial rights of a party.'"

*Whistler*, 2014 S.D. 58, ¶ 13, 851 N.W.2d at 910 (quoting *Cottier*, 2008 S.D. 79, ¶ 7, 755 N.W.2d at 125).

[¶50.]     At trial, the State's expert, Doctor Free, testified regarding the anatomy of the female genitalia and what type of contact would constitute labial or vulva coitus.  A.S. testified regarding the abuse, and Spaniol admitted penetrating the child's vagina.  In *State v. Packed*, we held that "when the State presents evidence of vulval or labial penetration, however slight, this act, if believed by the jury to have occurred, is sufficient to establish penetration of the genital opening." 2007 S.D. 75, ¶ 32, 736 N.W.2d at 861.  Not only is Instruction 11 a correct statement of law, but from our review of the record, there was substantial evidence of sexual penetration in all of the forms defined in Instruction 11 sufficient to warrant the instruction.  Further, Spaniol has failed to show that Instruction 11 affected the verdict and harmed his substantial rights.

## CONCLUSION

[¶51.]     The circuit court did not abuse its discretion when it found A.S. competent to testify.  The circuit court also did not violate Spaniol's Sixth Amendment right to confront the witnesses against him by refusing to declare A.S. unavailable for the purposes of cross-examination.  Neither did the circuit court err by refusing to suppress Spaniol's statements to law enforcement under the Fifth and Fourteenth Amendments.  Finally, the circuit court did not abuse its discretion by presenting jury Instruction 11 as written.  Affirmed.

[¶52.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON and WILBUR, Justices, concur.