#27736, #27738-a-GAS
**2017 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                  Plaintiff and Appellee,

v.

JOSEPH R. PATTERSON,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRADLEY G. ZELL
Judge
* * * *

MARTY J. JACKLEY
Attorney General

ROBERT MAYER
Deputy Attorney General

PAUL S. SWEDLUND
GRANT M. FLYNN
Assistant Attorneys General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

ELLERY GREY of
Grey & Eisenbraun Law
Rapid City, South Dakota

and

MICHAEL J. BUTLER
Sioux Falls, South Dakota               Attorneys for defendant
                                        and appellant.

* * * *

ARGUED OCTOBER 2, 2017
OPINION FILED **11/01/17**

#27736, #27738

SEVERSON, Justice

[¶1.]        Joseph Patterson appeals from a final judgment of conviction for second-degree murder.  Patterson claims the circuit court erred in: (1) allowing the State to present other acts evidence to the jury; (2) permitting the State to argue a factual theory of guilt and motive not supported by the record; (3) allowing the State to present expert testimony which was impermissibly intrusive; (4) refusing to allow Patterson to present additional instances of alleged child abuse committed by a possible third-party perpetrator; and (5) failing to grant Patterson's motion for acquittal.  Patterson also argues the South Dakota Supreme Court does not have jurisdiction to consider certain issues presented on notice of review by the State.

**Background**

[¶2.]        On October 9, 2013, Ashley Doohen (Doohen) picked up her two-year-old son, T.R., from daycare and brought him back to her apartment.  Doohen and T.R. shared the apartment with Doohen's boyfriend, Joseph Patterson (Patterson).  Doohen planned to leave T.R. in Patterson's care while she went to a nearby gym.  When Doohen left, T.R. was watching TV, eating fruit snacks, and appeared to be in a good mood.  At the time, T.R. was in the process of being potty-trained, and had received the fruit snacks as a reward for successfully using the bathroom.

[¶3.]        Shortly after Doohen arrived at the gym, she noticed two missed calls from Patterson.  When Doohen called Patterson back, Patterson informed Doohen that T.R. was not breathing and nonresponsive.  Doohen told Patterson to hang up and call 911.  Patterson attempted to call 911, but misdialed.  He connected on the second attempt and informed the dispatcher that T.R. was choking on a fruit snack.

Patterson told the dispatcher he had gotten the fruit snack out of T.R.'s mouth, but that T.R. was turning blue.

[¶4.] Doohen was away from her apartment for approximately fifteen minutes. When she arrived back, she began performing CPR on T.R. Shortly thereafter, Sioux Falls Police Officer Cody Schulz arrived at the apartment to find Patterson near the entrance waving and screaming. Patterson told Officer Schulz that a child was choking, that the mother was doing CPR, and that Officer Schulz needed to help the child. When Officer Schulz reached the apartment, he had Doohen stop CPR so he could examine T.R. Officer Schulz did not notice any obstruction of T.R.'s airway, but did notice a sweet smell, and a sticky substance around T.R.'s mouth, appearing to be from candy.

[¶5.] Paramedics arrived moments later, and T.R. was taken to Sanford Medical Center. Officer Schulz then interviewed Patterson about the incident. Patterson claimed when Doohen left for the gym, he left T.R. alone and went to the bathroom. Patterson stated that when he returned, he found T.R. lying slumped over and unresponsive on the couch. Patterson explained to Officer Schulz that he tried to assist T.R., and had removed a piece of gummy candy from the child's mouth. A piece of chewed gummy candy containing T.R.'s DNA was later retrieved from the floor of Doohen and Patterson's apartment.

[¶6.] When T.R. arrived at the hospital, a CT scan revealed intracranial hemorrhaging. An examination of T.R.'s eyes further revealed widespread retinal hemorrhaging. Two days later, on October 11, 2013, T.R. was declared brain dead,

and taken off of life support. An autopsy showed four subcutaneous hemorrhages on T.R.'s scalp consistent with blunt force trauma.

[¶7.] Based upon T.R.'s injuries, Patterson was charged with second-degree murder, first-degree manslaughter, and aggravated battery of a child. On September 29, 2015, after a trial, a jury convicted Patterson on all counts. On November 19, 2015, Patterson was sentenced to life in prison for second-degree murder, and 25 years to be served concurrently for aggravated battery of an infant. The trial court did not issue a sentence for manslaughter, finding the murder and manslaughter convictions arose from the same conduct.

[¶8.] Patterson appeals his conviction, claiming the circuit court erred in:

1. Allowing the State to present other acts evidence to the jury.

2. Permitting the State to argue a factual theory of guilt and motive not supported by the record.

3. Allowing the State to present expert testimony which was impermissibly intrusive.

4. Refusing to allow Patterson to present additional instances of alleged child abuse committed by a possible third-party perpetrator.

5. Failing to grant Patterson's motion for acquittal.

## Analysis

### 1. Whether the circuit court erred in permitting the State to present other acts evidence to the jury.

[¶9.] During Patterson's trial, Jasmin Leach (Leach), Patterson's former girlfriend, testified regarding three instances where Patterson allegedly abused her two minor sons. Leach stated the first incident occurred in 2010. Leach claimed that when her three-year-old son would not stop crying in the back seat of a car,

Patterson ripped the child from his car seat, threw the child against the back tire, pointed at the child, and threatened to call the police if the child did not stop crying.

[¶10.]     Leach described a second incident which allegedly took place in 2011. Leach stated she heard her son crying, and when she investigated, found Patterson forcing the child to do sit-ups hanging from the top level of a bunk bed. As Leach and Patterson began to argue, the child began to scream, and Leach stated Patterson slapped the child. Leach testified that later the same day, she came home to find Patterson applying ice to welts on her child's buttocks. When Leach asked Patterson about the welts, Patterson stated "You don't think I feel bad about this? I've been searching online all day about how to get rid of these welts." Leach testified that Patterson also applied olive oil to the welts. Photos of the welts taken two days after the alleged abuse were admitted at trial over Patterson's objection. Leach was also permitted to testify that Patterson was "very verbally, emotionally, and physically abusive."

[¶11.]     Patterson objected to the admission of these "other bad acts" in written briefs before trial. He also objected both before and after Leach testified. The circuit court admitted the evidence, determining it could be used for the limited purpose of proving Patterson's motive, or a lack of mistake or accident in T.R.'s death. The circuit court provided the jury with a limiting instruction to this effect. Patterson claims the evidence introduced through Leach's testimony amounted to propensity evidence, which inflamed the jury and unduly prejudiced him.

[¶12.]     We review a circuit court's decision to admit other acts evidence under the abuse of discretion standard. *State v. Toohey*, 2012 S.D. 51, ¶ 11, 816 N.W.2d

120, 127. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *State v. Birdshead*, 2015 S.D. 77, ¶ 51, 871 N.W.2d 62, 79 (quoting *Kaberna v. Brown*, 2015 S.D. 34, ¶ 13, 864 N.W.2d 497, 501). "We afford broad discretion to [circuit courts] in deciding whether to admit or exclude evidence. However, '[w]hen a [circuit] court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion.'" *Kurtz v. Squires*, 2008 S.D. 101, ¶ 3, 757 N.W.2d 407, 409 (alteration in original) (quoting *State v. Packed*, 2007 S.D. 75, ¶ 24, 736 N.W.2d 851, 859).

[¶13.]      To obtain a new trial due to erroneously admitted evidence, "a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *State v. Reay*, 2009 S.D. 10, ¶ 31, 762 N.W.2d 356, 366. "Prejudice, sufficient to require relief, must 'in all probability' have 'produced some effect upon the final result and affected rights of the party assigning it.'" *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 12, 875 N.W.2d 28, 32 (quoting *Reay*, 2009 S.D. 10, ¶ 46, 762 N.W.2d at 369).

[¶14.]      "Generally, evidence of crimes or acts other than the ones with which the defendant is charged are inadmissible, unless certain exceptions apply." *Birdshead*, 2015 S.D. 77, ¶ 57, 871 N.W.2d at 81. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." SDCL 19-19-404(b)(1). However, in a criminal case, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2).

A circuit court is required to perform a two-part balancing test to determine

whether certain evidence of a defendant's other acts are admissible. *Birdshead*,

2015 S.D. 77, ¶ 57, 871 N.W.2d at 81. "First, the court must determine whether the

other-act evidence is relevant to some material issue in the case other than

character (factual relevancy). Second, the court must determine whether the

probative value of the evidence is substantially outweighed by the danger of unfair

prejudice (logical relevancy)." *Id.*

[¶15.] At a motion hearing on September 14, 2016, the circuit court

considered whether to admit the three previous instances of alleged child abuse.

The court noted several similarities between those incidents and the incident with

T.R. Namely, the children were both near the same age, crying and whining shortly

before they were hurt, children of Patterson's live-in girlfriends, and under

Patterson's control as a father figure. The court reasoned these similarities were

enough to establish a potential motive for Patterson to harm T.R., and go toward

proving a lack of accident. The other acts were consistent with the State's theory:

that Patterson was easily angered by small children, and that Patterson reacted to

misbehaving children by using physical force, including blows to the head. The

circuit court also indicated it believed the probative value of the evidence was not

substantially outweighed by the prejudice to Patterson. With these conclusions, the

circuit court conducted the proper two-part analysis of the other acts evidence, and

correctly applied the applicable rule. Thus, as to the admission of the three prior

acts of alleged child abuse, there was no abuse of discretion.

[¶16.]    The circuit court did err, however, in allowing Leach to testify that Patterson was "very verbally, emotionally, and physically abusive" to her. At the September 16, 2016, motion hearing, the circuit court noted there were no relevant similarities between prior allegations of abuse of Leach and the death of T.R. The court held the evidence was only remotely relevant, and the probative value was substantially outweighed by the danger of prejudice to Patterson. Yet the circuit court allowed Leach to testify about Patterson's alleged abuse against her. Allowing that testimony from Leach was inconsistent with the circuit court's order, and thus, an abuse of discretion. However, Patterson has failed to show that the statement, by itself, "produced some effect upon the final result" of his trial. *Golliher-Weyer*, 2016 S.D. 10, ¶ 12, 875 N.W.2d at 32. Therefore, Patterson is not entitled to a new trial on this basis.

### 2. *Whether the circuit court erred in allowing the State to argue a factual theory of guilt and motive not supported by evidence.*

[¶17.]    The State submitted Patterson would become angry when young children would cry and whine around him, and that he tended to react by hitting the children. Specifically, the State theorized that on the night of October 9, 2013, T.R. began to whine when Patterson changed the TV channel from T.R.'s favorite show to a sports program. The State posited that Patterson reacted angrily by striking T.R. Patterson claims the State was never able to establish that this version of events occurred. Patterson alleges the State's presentation of this theory amounts to prejudicial prosecutorial misconduct.

[¶18.] "We review a claim of prosecutorial misconduct under the abuse of discretion standard." *State v. Bariteau*, 2016 S.D. 57, ¶ 23, 884 N.W.2d 169, 177. "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *Id.* "When misconduct occurs, 'we will reverse the conviction only if the misconduct has prejudiced the party as to deny him or her a fair trial.'" *State v. Pursley*, 2016 S.D. 41, ¶ 10, 879 N.W.2d 757, 760 (quoting *State v. Smith*, 1999 S.D. 83, ¶ 44, 599 N.W.2d 344, 354).

[¶19.] Here, the State did cite facts in evidence which could allow inferences to be drawn consistent with the State's theory. Patterson originally told police officers T.R. had been watching a children's cartoon, but then stated Patterson had been watching ESPN. An officer corroborated that the TV was tuned to college football highlights. The State referenced evidence of Patterson's former instances with children and his violent methods of disciplining. The State also pointed to the fact that Patterson first told police he was urinating when T.R. was left alone, and then later changed his story to say he was defecating instead.

[¶20.] However, "[i]t is well established that the prosecutor and the defense have considerable latitude in closing arguments, for neither is required to make a colorless argument. Counsel has a right to discuss the evidence and inferences and deductions generated from the evidence presented." *Smith*, 1999 S.D. 83, ¶ 42, 599 N.W.2d at 353 (citations omitted). A prosecutor may "point[] out discrepancies and conflicts in the testimony, and argue that the evidence in the record supports and justifies a conviction . . . ." *State v. Janis*, 2016 S.D. 43, ¶ 37, 880 N.W.2d 76, 86 (Kern, J., concurring in part and dissenting in part) (quoting *Smith*, 1999 S.D. 83, ¶

46, 599 N.W.2d at 354). Taking these principles into consideration, we cannot say that the inferences drawn by the State in this case amounted to prosecutorial misconduct. At any rate, even if misconduct existed, the State's closing remarks did not deprive Patterson of a fair trial. There was no abuse of discretion.

### 3. *Whether the circuit court erred in allowing the State to present expert testimony which was impermissibly intrusive.*

[¶21.] Patterson questions the State's presentation of expert testimony of nine different doctors. Each doctor presented an opinion that T.R.'s cause of death was abusive head trauma; contradicting Patterson's contention that T.R. died from choking. Patterson objects to the admission of all of these experts' testimony, claiming the opinions invaded the province of the jury, were conclusory, and told the jury what conclusions it should reach.

[¶22.] "[T]he trial court has broad discretion in regard to the admission of expert testimony." *State v. McKinney*, 2005 S.D. 73, ¶ 31, 699 N.W.2d 471, 481 (alteration in original). "A trial court's decision to admit such testimony will not be reversed absent a clear showing of an abuse of discretion." *Id.*

[¶23.] Not "all expert opinion on the ultimate issue [of a case] is admissible." *State v. Buchholtz*, 2013 S.D. 96, ¶ 24, 841 N.W.2d 449, 457. "It is the function of the jury to resolve evidentiary conflicts, determine the credibility of witnesses, and weigh the evidence." *Id.* Expert opinions that only tell a jury what conclusions they should reach are impermissible as overly intrusive on the province of the jury. *Id.*; *see also State v. Guthrie*, 2001 S.D. 61, ¶ 33, 627 N.W.2d 401, 415.

[¶24.]     A full review of the trial transcript does not reveal any instances where the nine challenged experts improperly expressed what conclusions the jury should reach. Each expert consistently stated their expertise and training, their involvement in the case, and their diagnosis or opinion. It was clear that the experts' conclusions were merely the opinion of that particular physician. Further, Patterson fully developed a competing theory through cross-examination of the State's experts, as well as the presentation of his own expert witnesses. With this amount and quality of expert testimony before it, the jury had an adequate opportunity to make a determination as to the credibility of the evidence. Thus, the province of the jury was not invaded, and the circuit court did not err in allowing the State to present testimony from its multiple expert witnesses.

> ### 4. *Whether the circuit court erred in refusing to allow Patterson to present additional instances of alleged child abuse committed by a possible third-party perpetrator.*

[¶25.]     Patterson claims the circuit court precluded him from presenting and fully developing an adequate defense. He uncovered several instances of child abuse by T.R.'s daycare provider, Marilyn Knurck (Knurck), and presented Knurck as a potential third-party perpetrator who could have contributed to T.R.'s injuries. Patterson was allowed to introduce two instances of child abuse by Knurck: an incident where a child developed a brain bleed after Knurck dropped him on the floor, and another where a child was bruised while in Knurck's care. Knurck was convicted for contributing to abuse or neglect of a child for the latter incident. In his brief, Patterson mentions six additional instances of child abuse which he was not allowed to introduce.

[¶26.]     At a motion hearing on September 14, 2015, the circuit court addressed each alleged instance of child abuse by Knurck.  The court considered the relevance of each episode, their proximity in time and location to T.R.'s injury, and Knurck's possible motives.  The court also noted the importance of balancing Patterson's interest in admitting the third-party perpetrator evidence against the State's interest in excluding it.  The court then ruled as to the admissibility of each event and did not abuse its discretion.

### 5.  Whether the circuit court erred by failing to grant Patterson's motion for judgment of acquittal.

[¶27.]     "The standard of review for a circuit court's ruling on a motion for judgment acquittal is well settled[.]"  *State v. Thomason*, 2014 S.D. 18, ¶ 14, 845 N.W.2d 640, 643.

> The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo.  We must decide anew whether the evidence was sufficient to sustain a conviction.  In measuring evidentiary sufficiency, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Id.* (quoting *State v. Podzimek*, 2010 S.D. 17, ¶ 6, 779 N.W.2d 407, 409).

[¶28.]     Patterson claims the State's theory rested largely on testimony from expert witnesses.  The witnesses testified to the assumption that retinal hemorrhages, subdural hematoma, and brain swelling establish that a child was intentionally injured.  These types of injuries are sometimes referred to as "the triad" or "shaken baby syndrome."  Because T.R. demonstrated all of these injuries, the State claimed T.R. died from head trauma caused by Patterson.

[¶29.] Patterson cites several cases which call the viability of the triad theory into question. *See State v. Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008); *Commonwealth v. Millien*, 50 N.E.3d 808 (Mass. 2016); *Ex Parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012); *People v. Bailey*, 999 N.Y.S.2d 713 (N.Y. Cty. Ct. 2014); *In re Fero*, 367 P.3d 588 (Wash. Ct. App. 2016). He states these cases establish that the theories behind shaken baby syndrome and abusive head trauma are currently not widely accepted by the medical community. Patterson claims the questionability of theories—coupled with testimony to the contrary by Patterson's expert witnesses and a lack of eyewitnesses—creates a reasonable doubt as to Patterson's guilt.

[¶30.] The viability of the triad theory notwithstanding, the State's expert witnesses adequately addressed Patterson's theory that T.R. died from choking. The State points to the testimony of nine of the State's experts, who concluded T.R.'s injuries were consistent with non-accidental trauma, and inconsistent with choking. The State also notes that on cross-examination, Patterson's expert witnesses were unable to rule out blunt force trauma as a cause of T.R.'s death. Due to the extent and quality of this expert testimony, it was reasonable, especially in a light most favorable to the prosecution, for the jury to have found the essential elements of second-degree murder and aggravated battery of an infant beyond a reasonable doubt. There was sufficient evidence to sustain a conviction against Patterson, and the circuit court did not err in denying Patterson's motion for judgment of acquittal.

### 6. *Whether this Court has jurisdiction over issues contained in the State's notice of review.*

[¶31.]     The State filed a notice of review on January 29, 2016, asking this Court to consider: (1) whether the circuit court erred when it prohibited the pathologist who conducted T.R.'s autopsy or the coroner from testifying as to the manner of death; and (2) whether the circuit court erred when it allowed an instruction on consciousness of innocence.  Patterson claims this Court does not have jurisdiction over these issues.  However, the State did not address this issue in its appellate brief or provide any argument in support.  "[F]ailure to cite supporting authority in an appellate brief violates SDCL 15-26A-60(6) and waives the issue before this court." *First Nat'l Bank in Sioux Falls v. Drier*, 1998 S.D. 1, ¶ 20, 574 N.W.2d 597, 601.

### Conclusion

[¶32.]     The circuit court did not abuse its discretion or err in deciding any issues raised by Patterson on appeal.  We affirm.

[¶33.]     GILBERTSON, Chief Justice, and ZINTER and KERN, Justices, and WILBUR, Retired Justice, concur.