#27869-a-SRJ
**2018 S.D. 13**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

CHRISTOPHER DEAN KRYGER,                    Defendant and Appellant.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MARK E. SALTER
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


MARK KADI and
AUSTIN VOS of
Minnehaha County Office
   of the Public Advocate
Sioux Falls, South Dakota                    Attorneys for defendant
                                        and appellant.

\* \* \* \*

ARGUED ON
JANUARY 9, 2018
OPINION FILED **02/07/18**

JENSEN, Justice

[¶1.] Christopher Dean Kryger appeals his convictions for first-degree murder, first-degree burglary, and second-degree rape. He claims the circuit court erred in ruling on a number of issues and that these errors, both separately and in the aggregate, entitle him to a new trial. We affirm.

## Background

[¶2.] At approximately 10:00 p.m. on Friday, March 14, 2014, Kari Kirkegaard returned to her home on South Garfield Avenue in Sioux Falls after having supper with her family. On Sunday, March 16, 2014, Kirkegaard's son's fiancée, Paetyn Haemze (Haemze), went to Kirkegaard's home after failed attempts to reach her via phone. Haemze noticed Kirkegaard's blue SUV parked in the driveway of the home and that the back door was unlocked. Upon entering the home, Haemze heard water running. She investigated the bathroom and found Kirkegaard's body lying naked on her side in a full bathtub with the water running.

[¶3.] Haemze first called Kirkegaard's son and then called 911. Sioux Falls Police Officer Pat Mertes responded to the scene and noted Kirkegaard's body in the bathtub facing toward the door. Officer Mertes did not notice anything else unusual. Additional fire, ambulance, and police personnel arrived shortly thereafter. Police took photographs of Kirkegaard's body, drained the bath water, removed the body, and checked the rest of the home. They found no apparent signs of forced entry, foul play, or physical trauma. None of the first responders reported any smell of bleach.

[¶4.]      After emergency personnel left, Kirkegaard's brother, Brian Johnson (Johnson), punched a hole in the wall of Kirkegaard's bathroom. Family members noticed that Kirkegaard's bedsheets, purse, SUV keys, and towels and rugs from the bathroom were missing. They also noticed a strong smell of bleach. Police were called back to the scene approximately one hour after they had left. This time, officers interviewed family and friends present at the scene. The officers also noted a strong odor of bleach in the home at this time. Law enforcement then began a homicide investigation.

[¶5.]      During police interviews, Kirkegaard's friends and family members described her as a homebody who stuck within a small circle of friends and family. Kirkegaard had previous romantic interests, but she was not in any relationships at the time of her death. It was soon discovered that a mosque located two lots north of Kirkegaard's home possessed camera surveillance footage between March 14, 2014, and March 16, 2014. The mosque's camera faced southeast and had captured a view of Kirkegaard's front lawn, driveway, Garfield Avenue, and Garfield Elementary School.

[¶6.]      The footage showed Kirkegaard's SUV returning to her home on the night of March 14 after she had supper with her family. It also showed a bicyclist riding past Kirkegaard's residence heading north at 11:30 p.m. that evening. The bicyclist doubled back on the sidewalk of Kirkegaard's home, then slowed down. A person was seen crossing the street in front of the mosque around 2:30 a.m. on March 15. The person was wearing a plaid flannel coat, jeans, and dark shoes, and appeared to have a shiny object in their hands. The person's face was not visible.

After the individual left the view of the camera, Kirkegaard's vehicle was seen leaving her driveway and travelling north with the headlights off. Kirkegaard's SUV returned about an hour later, at 3:30 a.m. The driver missed Kirkegaard's driveway, then turned around in the parking lot of Garfield Elementary School. The SUV parked in Kirkegaard's driveway, and the same individual was seen leaving on a bicycle. None of the camera footage captured who was in the vehicle or showed anyone entering or leaving Kirkegaard's residence.

[¶7.] Police eventually released the mosque video to the public. After receiving several tips, they were led to interview Kryger's friend Michael Miller, Kryger's fiancée, Lori Nagel, and Kryger's uncle and employer Richard Foster. Nagel and Miller indicated that the person seen in the video could have been Kryger, as the person had a similar gait and wore similar clothing. They also confirmed Kryger typically used his bicycle for transportation around Sioux Falls. Nagel told police that she and Kryger had an argument the night of March 14. She stated Kryger returned to her home around 4:30 a.m. to reconcile. Miller stated that he ran into Kryger on March 15, and the pair visited Walmart where Kryger bought an engagement ring for Nagel, a new cell phone, and a cell phone plan.

[¶8.] Kryger was contacted by police and taken to the Sioux Falls law enforcement center for an interview. In the interview, Kryger stated he became upset with Nagel on the night of March 14 and decided to go on a long bike ride around Sioux Falls. Kryger claimed that during this ride, he was nearly struck by an SUV without its headlights on just north of Kirkegaard's home. He also stated that later in the evening, his bike slid into the river. Kryger maintained that he

returned home to wash his dirty clothes and called Nagel to reconcile. He stated he then rode his bike to Nagel's home and remained there until morning. Kryger discussed seeing Miller on March 15 and confirmed that the pair had gone shopping at Walmart. Kryger denied ever having sex with Kirkegaard. Kryger also made comments about having a "criminal mind."

[¶9.] Police collected hundreds of items in the course of their investigation of Kirkegaard's death. Only some of the items were tested. An autopsy performed on Kirkegaard's body revealed ligature furrows across her neck in two parallel lines, petechial hemorrhages, numerous small abrasions, a fractured hyoid bone, and fractured thyroid cartilage. The examination also revealed small abrasions on the outside wall of Kirkegaard's vaginal vault. The coroner was unable to pinpoint a time of death but concluded Kirkegaard was asphyxiated and that the manner of death was homicide. A rape kit conducted on Kirkegaard's body tested positive for Kryger's sperm cell DNA.

[¶10.] Kryger was arrested and indicted on five counts of first-degree murder, one count of second-degree murder, one count of second-degree rape, one count of third-degree rape, and two counts of first-degree burglary. The jury convicted Kryger on all counts except third-degree rape. On February 25, 2016, Kryger was sentenced to life in prison for first-degree murder, 50 years for second-degree rape, and 25 years for first-degree burglary to run concurrently with the first-degree murder sentence, but consecutive to the sentence for second-degree rape. Kryger appeals his conviction and sentence, raising several issues for our review, which we combine and restate as follows:

1.      Whether the circuit court erred by precluding questioning of Johnson concerning his bias against Kryger.

2.      Whether the circuit court erred by admitting expert testimony expressed in terms of possibilities.

3.      Whether the circuit court erred by admitting irrelevant evidence without a foundation of physical evidence from the State's investigation of Kryger.

4.      Whether the circuit court erred by admitting Kryger's statements that he has a criminal mind.

5.      Whether the circuit court erred by denying Kryger's motions for mistrial.

6.      Whether the circuit court erred by denying Kryger's proposed jury instructions regarding Kryger's statements about his criminal mind, speculation and conjecture, and an alibi defense.

7.      Whether the circuit court erred by denying Kryger's motion for judgment of acquittal.

8.      Whether the accumulation of the errors claimed by Kryger constitute reversible error.

## Analysis

**1.      Whether the circuit court erred by precluding questioning of Johnson concerning his bias against Kryger.**

[¶11.]      Kryger argues he was deprived of his due process and Confrontation Clause rights when the circuit court denied Kryger the opportunity to cross-examine Johnson concerning threats Johnson made toward Kryger and defense counsel prior to trial. This included a threat to defense counsel at the conclusion of a pretrial hearing where Johnson stated words to the effect that defense counsel had better be a light sleeper. Johnson also made comments to the media that he would torture and kill Kryger if Kryger were released or not convicted. On Facebook, Johnson suggested he would harm or kill Kryger and defense counsel.

Johnson's actions prompted the circuit court to exclude Johnson from Kryger's trial, but the State was allowed to call Johnson as a witness.

[¶12.] Before Johnson's testimony, the State orally moved to preclude Kryger from referencing any threatening comments made by Johnson. The circuit court precluded Kryger from cross-examining Johnson about the threats. Kryger claims the circuit court's ruling totally deprived him of the ability to effectively cross-examine Johnson. He argues Johnson's bias created a motive for Johnson to fabricate and exaggerate his testimony. Kryger maintains that without the ability to question Johnson regarding his bias, he was denied the right to a fair trial.

[¶13.] "We review a circuit court's evidentiary rulings under an abuse of discretion standard with a presumption that the rulings are correct." *State v. Birdshead*, 2015 S.D. 77, ¶ 36, 871 N.W.2d 62, 75-76. A circuit court's decision to limit cross-examination will be reversed only if there is both an abuse of discretion and a showing of prejudice to the defendant. *State v. Carter*, 2009 S.D. 65, ¶ 31, 771 N.W.2d 329, 338. Prejudice exists only when "a reasonable jury probably would have a significantly different impression if otherwise appropriate cross-examination had been permitted." *Birdshead*, 2015 S.D. 77, ¶ 36, 871 N.W.2d at 76 (quoting *State v. Johnson*, 2007 S.D. 86, ¶ 35, 739 N.W.2d 1, 13).

[¶14.] Because a defendant's right to present a defense is fundamental, we review limitations on cross-examination under the Confrontation Clause. *See id.* ¶ 37. "The Confrontation Clause of the Sixth Amendment to the United States Constitution, as applied to South Dakota through the Fourteenth Amendment, requires that in all criminal cases, the defendant has the right 'to be confronted

with the witnesses against him.'" *State v. Spaniol*, 2017 S.D. 20, ¶ 24, 895 N.W.2d 329, 338 (quoting U.S. Const. amend. VI). The Confrontation Clause applies to witnesses testifying at trial, and is "generally satisfied when the defense is given a full and fair opportunity to probe and expose a witness' infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Id.* (quoting *State v. Carothers*, 2006 S.D. 100, ¶ 16, 724 N.W.2d 610, 617).

[¶15.] In limiting Kryger's cross-examination, the circuit court recognized that the threats went to bias but had a "marginal degree of relation [to] this case." The court noted that Johnson's direct testimony was likely to be narrow and factual, and pertain only to the investigatory timeline of Kirkegaard's death. Indeed, Johnson's testimony *was* short and limited to describing Johnson's relationship with Kirkegaard and Johnson's factual observations immediately after Kirkegaard's body was discovered. The circuit court also concluded that Johnson's threats were not contemporaneous with the events Johnson was testifying about, and that the jury would be cognizant of Johnson's bias because of Johnson's close familial relationship with Kirkegaard. The circuit court noted that Kryger's counsel could still impeach Johnson on bias or factual issues if there was a concern that Johnson was fabricating his story. After determining the threats had marginal relevance, the circuit court conducted a balancing test under SDCL 19-19-403. Under this test, the court determined the marginal probative value of the threats was substantially outweighed by the danger of unfair prejudice—including the possibility of jury confusion of the issues and a waste of time.

[¶16.] The circuit court limited cross-examination only with respect to the specific threats made toward Kryger and his counsel, and Johnson's belief of Kryger's guilt. Kryger was not precluded from asking if Johnson held any bias against Kryger because of Johnson's family relationship with Kirkegaard. Further, the jury heard about Johnson's emotional reaction of punching the bathroom wall in Kirkegaard's home immediately after learning of her death. Finally, Kryger also had the opportunity to question Johnson on any factual matters that were allegedly fabricated without referencing Johnson's threats. "An individual is only guaranteed 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Spaniol,* 2017 S.D. 20, ¶ 29, 895 N.W.2d at 340 (emphasis omitted) (quoting *Milstead v. Smith*, 2016 S.D. 55, ¶ 13, 883 N.W.2d 711, 717).

[¶17.] We conclude that the circuit court did not abuse its discretion in limiting cross-examination on the specific threats made by Johnson toward Kryger and his counsel. We also determine that Kryger did not suffer any prejudice because of the circuit court's decision to limit cross-examination. Johnson's testimony was mostly limited to the events immediately after Kirkegaard's body was found and the circumstances leading law enforcement to begin a homicide investigation. Other friends and family members testified to many of the same facts: namely, that they had smelled bleach or a very clean smell after police had left, that no one had done any cleaning after police had left, and that they noticed Kirkegaard's purse and other items from the house were missing. Further, none of the threats related to the subject areas of Johnson's testimony.

### 2. Whether the circuit court erred by admitting expert testimony expressed in terms of possibilities.

[¶18.] Before trial, Kryger filed a motion in limine seeking to prevent Dr. Kenneth Snell, the county coroner who performed Kirkegaard's autopsy, from giving an opinion that the injuries to Kirkegaard's vaginal area were indicative of those received from either consensual or non-consensual sex. The circuit court permitted Dr. Snell to testify that the trauma to Kirkegaard's vaginal area could have been the result of either rough consensual intercourse or a sexual assault. Kryger claims this testimony was not relevant; it confused the jury and invited the jury to speculate as to Kryger's guilt. Kryger also argues that Dr. Snell's conclusion was not proper opinion testimony because it was phrased only as a possibility, and not to a reasonable degree of probability. He reasons that because Dr. Snell could not state definitively that the trauma was the result of or consistent with a sexual assault, it should have been excluded.

[¶19.] "We afford broad discretion to circuit courts in deciding whether to admit or exclude evidence." *State v. Patterson*, 2017 S.D. 64, ¶ 12, 904 N.W.2d 43, 48 (quoting *Kurtz v. Squires*, 2008 S.D. 101, ¶ 3, 757 N.W.2d 407, 409). Thus, a circuit court also has broad discretion in deciding whether to admit expert testimony. *Id.* ¶ 22, 904 N.W.2d at 50.

[¶20.] A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b)    The testimony is based on sufficient facts or data;
    (c)    The testimony is the product of reliable principles and methods; and

> > (d) The expert has reliably applied the principles and methods to the facts of the case.

SDCL 19-19-702. "There are no 'magic words' needed to express an expert's degree of medical certainty, and the test is only whether the expert's words demonstrate that he or she was expressing an expert medical opinion." *Stormo v. Strong*, 469 N.W.2d 816, 824 (S.D. 1991).

[¶21.] Here, the circuit court heard Kryger's motion in limine at a pretrial hearing. After arguments from counsel, the court opted not to rule fully on the motion until hearing Dr. Snell's testimony at trial. At trial, Dr. Snell testified that based upon his autopsy, Kirkegaard's injuries "would have been due to some object being forcibly put into the vaginal area." Because laboratory testing subsequently found the presence of semen in Kirkegaard's vagina, Dr. Snell also opined that the injuries were likely caused by intercourse. Dr. Snell concluded that these injuries to Kirkegaard's vaginal area were due to either "rough intercourse or an assault" and not to what the prosecutor classified as "normal, consensual sex." During cross-examination, Dr. Snell acknowledged that he could not determine whether or not the sexual intercourse was consensual or nonconsensual because he was not present during the commission of the act.

[¶22.] Dr. Snell's medical opinions in his testimony were clear and were based upon a reasonable degree of medical certainty. His opinion was supported by an adequate foundation in the record and assisted the jury in considering the evidence presented in the case. Thus, Dr. Snell's challenged testimony was admissible and there was no abuse of discretion.

**3.   Whether the circuit court erred by admitting irrelevant evidence without a foundation of physical evidence from the State's investigation of Kryger.**

[¶23.]   During the investigation of Kirkegaard's death, police were alerted to the presence of a burn pit in Sioux Falls, which law enforcement believed to be connected to Kryger.  The State presented testimony describing the burn pit and how it was investigated, and showed photographs to the jury.  Kryger objected to that evidence on foundation and relevance grounds, arguing that neither the burn pit nor any items found there were forensically tested to determine any connections to him.  Kryger claims that by permitting this evidence, the circuit court misapplied the rules of relevant evidence and abused its discretion.

[¶24.]   "Evidence is relevant if: (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action."  SDCL 19-19-401.  "It is well settled that photographs are generally admissible where they accurately portray anything that a witness may describe in words . . . [and] when they are helpful in clarifying a verbal description of objects and conditions.  They must, however, be relevant to some material issue."  *State v. Hemminger*, 2017 S.D. 77, ¶ 33, 904 N.W.2d 746, 757 (quoting *State v. Owens*, 2002 S.D. 42, ¶ 89, 643 N.W.2d 735, 756-57).

[¶25.]   Here, evidence of the burn pit was relevant, as it made it more probable that Kryger had destroyed evidence associated with Kirkegaard's murder.  Police became aware of the burn pit when they responded to a tip from a concerned member of the public shortly after the crime had occurred.  The witness indicated he had seen the burn pit in a remote area near the Big Sioux River and that "fabric in the fire" had caught his attention, so he contacted police.  Miller testified that

Kryger told him he burned his plaid flannel jacket after the mosque video footage had been released to the public. Further, the photographs of the burn pit portrayed what police and other witnesses had seen during their investigation of Kryger. Sioux Falls Police Officer Chad Winkel testified he had investigated the burn pit, that he believed it was fresh, but he noted police could not determine a source or identify any items that had been burned as belonging to Kryger. The fact that none of the items related to the burn pit were forensically tested went to the weight of this evidence, not its admissibility. The evidence revealed a sufficient link between Kryger and the burn pit, and therefore, the circuit court did not abuse its discretion in admitting it.

### 4. Whether the circuit court erred by admitting Kryger's statements that he has a criminal mind.

[¶26.] During the investigation, Kryger was interviewed by Sioux Falls Police Detectives Robert Forster and Martin Hoffman. In both interviews, Kryger made references about having "a criminal mind." In the interview with Detective Forster on March 16, 2014, Kryger expressed concern for the safety of his fiancée living in the area where Kirkegaard had been killed. In response, Detective Forster told Kryger that law enforcement was advising people to lock their doors and use the buddy system for protection. Kryger then stated he did not believe that would work because "if I actually have a criminal mind . . . if I want to get into a place, I'll just kick the door in . . . and . . . that's not stopping [inaudible] nobody." During the interview with Detective Hoffman on March 20, 2014, Kryger was asked about whether he could identify the SUV that he claimed almost ran into him with its

lights off. Kryger responded that he had "a criminal mind" and did not pay attention to those things.

[¶27.]    Before trial, Kryger moved to exclude both statements on the basis that they were inadmissible character evidence. The State argued Kryger's statements were admissible to prove Kryger had the requisite intent or state of mind. The circuit court denied Kryger's motion, holding the statements were not character evidence, but rather, statements against interest. The circuit court reasoned that because the statements were Kryger's own voluntary admissions, they did not pertain to character and the jury could consider them as evidence of his involvement. The circuit court also balanced the statements under Rule 403 and determined their relevance was not substantially outweighed by the danger of unfair prejudice.

[¶28.]    In determining that these statements were admissions against interest by Kryger, the circuit court did not explain why they were probative to the case. Kryger asserts that if the statements were admissions, they were admissions about his character, which were inadmissible under SDCL 19-19-404(a)(1). *See also State v. Janis*, 2016 S.D. 43, ¶ 38 n.3, 880 N.W.2d 76, 87 n.3. Kryger also argues the probative value of these statements were outweighed by the danger of unfair prejudice toward him and that the jury confused his statement as admitting the mens rea elements of the crimes with which he was charged. The State responds that the circuit court correctly allowed the statements as admissions that the jury could consider and that they were relevant to the crimes charged.

[¶29.] Kryger's statement to Detective Forster appears to be stated hypothetically that precautions recommended by law enforcement would not protect against himself or someone with a criminal mind from committing the offense. In the interview with Detective Hoffman, Kryger directly stated he had a criminal mind. The statements are ambiguous in their meaning. It is possible that the jury could have considered the statements as evidence that Kryger knew something about the crime or how to commit the crime. However, it is also possible that the jury may have considered the statements as admissions by Kryger about his character; that he was the *kind* of person who would have committed this crime.

[¶30.] Kryger claims the admission of these statements is reversible error. However, "[t]o obtain a new trial due to erroneously admitted evidence, 'a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice.'" *Patterson*, 2017 S.D. 64, ¶ 13, 904 N.W.2d at 48 (quoting *State v. Reay*, 2009 S.D. 10, ¶ 31, 762 N.W.2d 356, 366). Prejudice must have produced an effect on the final result of a trial and affected the rights of the party claiming the prejudice. *Id.*

[¶31.] Kryger has failed to show prejudice in the admission of these statements. Both statements were general in nature and were not expounded on further during either interview. The statements were made without any context as to whether Kryger had committed similar offenses or had ever been previously convicted of any crime. Although the State referenced Kryger's statements in closing arguments, such argument was limited and was neither the theme nor central focus. Most importantly, there was substantial independent evidence, apart

from the two statements, establishing Kryger's guilt. Kryger has failed to show that the admission of his two voluntary statements had an effect on the outcome of the verdict. Thus, there was no prejudice.

5. **Whether the circuit court erred by denying Kryger's motions for mistrial.**

[¶32.] Prior to trial, the circuit court granted several of Kryger's motions to exclude any evidence or reference to his criminal record or incarceration status. Kryger claims that the circuit court's pretrial orders were violated on three occasions during the trial. First, Detective Forster testified he had received Kryger's cell phone number from Kryger's parole officer. Second, as the jury was hearing an audio recording of a phone call between Kryger and Nagel, it also heard an automated message indicating that Kryger was incarcerated. Finally, Kryger accidentally encountered the jury while being escorted by two officers after trial proceedings had concluded for the day. Kryger claims the circuit court's refusal to grant a mistrial for each of these errors deprived him of his right to a fair trial.

[¶33.] "Motions for mistrial are within the discretion of the trial judge." *State v. Ball*, 2004 S.D. 9, ¶ 16, 675 N.W.2d 192, 197 (quoting *State v. Johnson*, 2001 S.D. 80, ¶ 9, 630 N.W.2d 79, 82). Therefore, "denial of a motion for mistrial will not be overturned unless there is an abuse of discretion." *Id.* Here, the circuit court reserved ruling on each of the motions for mistrial until the conclusion of the case so that the court could consider the potential impact of any violations in light of the entire record.

[¶34.] The circuit court immediately addressed Detective Forster's reference to Kryger's parole officer during the trial. The circuit court acknowledged that the

testimony was a violation (although unintentional) of the court's order. To neutralize the impact of the testimony, the court instructed the jury to disregard the source of Kryger's cell phone number; and the court warned Detective Forster in chambers not to make any more references to Kryger's parole status, prison time, or criminal history. At the end of the trial, the court denied the motion for mistrial, reasoning that a mistrial would be an extreme remedy in light of the innocuous nature of Detective Forster's remark and its limited potential to influence the jury.

[¶35.] The circuit court also considered Kryger's motion for mistrial concerning the automated portion of the phone call improperly played for the jury. The circuit court noted the mechanized voice message did not specifically mention why Kryger was incarcerated, the nature of Kryger's past involvement with the criminal justice system, or any inadmissible other-acts evidence. The circuit court also presented a limiting instruction to the jury directing it to disregard the entire automated portion of the message.

[¶36.] Finally, the circuit court considered the encounter between Kryger and the jury. The circuit court heard in-chambers testimony from the bailiff present during the incident. The bailiff indicated the meeting was accidental and had occurred when the jury stopped in an elevator on the same floor as Kryger as he was waiting for a ride. The two deputies who were escorting Kryger were wearing civilian clothes and were not armed or carrying restraints. The circuit court noted Kryger was in civilian clothes and was not visibly restrained. Additionally, the circuit court drew attention to the fact that the encounter was after hours and that the jurors were accustomed to seeing participants in the case. The court also stated

that the jury could already draw a reasonable inference that Kryger was being escorted by law enforcement given the nature of the case.

[¶37.]     The circuit court's review of these three occurrences and the decision to deny Kryger's motions for a mistrial were well-reasoned.  The circuit court also took adequate measures to minimize the impact of these errors and considered their import at the conclusion of the trial in light of all the evidence.  There is no showing that any of the errors were intentional, and none of the errors went directly to the question of Kryger's guilt.  The circuit court was in the best position to consider the impact of these errors on the jury and determined that the errors did not deprive Kryger of a fair trial.  This decision is supported by the record, and there was no abuse of discretion.

**6.     Whether the circuit court erred by denying Kryger's proposed jury instructions regarding Kryger's statements about his criminal mind, speculation and conjecture, and an alibi defense.**

[¶38.]     Kryger challenges the circuit court's decision to reject several of his proposed jury instructions.  Kryger's first set of proposed instructions stated: "Evidence that the Defendant described himself as having a criminal mind does not in itself mean the Defendant possessed a [depraved mind/premeditated design]. You must consider any such evidence in conjunction with all other evidence presented."  Kryger claimed the instruction was needed to mitigate the statements admitted regarding Kryger's criminal mind.

[¶39.]     Kryger also proposed five alternative jury instructions that he claimed defined speculation and conjecture.  He contended these jury instructions were needed to respond to testimony from Dr. Snell, the testing procedures used during

the investigation of Kirkegaard's death, and the large number of items of evidence collected by police during the investigation. The circuit court rejected Kryger's instructions, and instructed the jury as follows:

> **Instruction No. 58**. It is your duty to decide from the evidence what the facts are and whether the defendant is guilty or not guilty of the crimes charged. You must base that decision on the facts and the law.
>
> First, you must determine the facts from the evidence received in the trial and not from any other source. You are entitled to consider the evidence in the light of your own observations and experiences in the affairs of life. You may use reason and common sense to draw deductions or conclusions from facts which have been established by the evidence. However, your verdict must not be based upon speculation, guess or conjecture.
>
> Second, you must apply the law that I state to you, to the facts, as you determine them, and in this way, arrive at your verdict. You must accept and follow the law as I state it to you, whether or not you agree with the law.

[¶40.]     Finally, Kryger proposed an alibi jury instruction. The circuit court ruled that Kryger was not entitled to an alibi instruction and instead instructed the jury as follows:

> **Instruction No. 16**. The indictment charges that the offense was committed "on or about" a certain date. The proof need not establish with certainty the exact date of the offense alleged. It is sufficient if the evidence establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

[¶41.]     "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *Spaniol*, 2017 S.D. 20, ¶ 49, 895 N.W.2d at 345 (quoting *State v. Whistler*, 2014 S.D. 58, ¶ 13, 851 N.W.2d 905, 910). Jury instructions are considered as a whole. *State v. Jensen*,

2007 S.D. 76, ¶ 19, 737 N.W.2d 285, 291. If they "correctly state the law and inform the jury, they are sufficient." *Id.* (quoting *State v. Johnston*, 478 N.W.2d 281, 283 (S.D. 1991)). A circuit court does not err simply by refusing "to amplify instructions which substantially cover the principle embodied in the requested instruction." *State v. Klaudt*, 2009 S.D. 71, ¶ 20, 772 N.W.2d 117, 123.

[¶42.]     As to Kryger's proposed state-of-mind instructions, the circuit court pointed out that Kryger's statements about criminal mind were couched in ordinary, conversational terms and that Kryger's proposed instructions would only highlight the statements to the jury. The circuit court also noted Kryger had a full opportunity to challenge the nature of his own remarks through the cross-examination of Detectives Hoffman and Forster, and could further challenge these statements in closing arguments. Moreover, the circuit court provided proper instructions to the jury explaining the elements of the crimes and the intent necessary for each one.

[¶43.]     The circuit court rejected Kryger's instructions on speculation and conjecture because it believed Instruction 58 was a better and more accurate statement of South Dakota law. The court further noted that Kryger's proposed instructions suggested that the amount of evidence available in a case was more important than the force of the evidence—which the court believed to be incorrect. Finally, the court noted Kryger could still argue to the jury that it could not or should not speculate about evidence even without the additional instructions.

[¶44.]     Finally, the circuit court reexamined evidence of Kryger's whereabouts around the time of Kirkegaard's death to determine whether he was entitled to an

alibi defense. Based on the mosque video, which placed Kryger in the vicinity of Kirkegaard's home, the fact that Kryger was only able to partially explain his whereabouts on the night of March 14, 2014, and because Kryger had not complied with timely notice of alibi under SDCL 23A-9-1, the court determined that the evidence did not warrant an alibi instruction.

[¶45.] The circuit court thoroughly analyzed each of Kryger's proposed instructions and provided adequate reasoning for rejecting them. Additionally, the instructions provided to the jury were proper and accurate statements of the law. Therefore, there was no abuse of discretion by the circuit court in denying Kryger's proposed instructions.

### 7. Whether the circuit court erred by denying Kryger's motion for judgment of acquittal.

[¶46.] Kryger claims the lack of proof present in the record demonstrated that he was convicted in error based on speculation by the jury. Specifically, Kryger argues the State failed to prove the premeditated design required for first-degree murder, the depraved mind required for second-degree murder, and the intent required for first-degree burglary. He also argues that the evidence was insufficient for the jury to find force, coercion, or threats required for rape. He maintains the circuit court erred in denying his motion for judgment of acquittal because "the evidence [was] insufficient to sustain a conviction of the offense or offenses." *See* SDCL 23A-23-1.

[¶47.] We review a denial of a motion for judgment of acquittal de novo. *State v. Bosworth*, 2017 S.D. 43, ¶ 11, 899 N.W.2d 691, 694.

> When reviewing whether evidence is sufficient to sustain a conviction, we "consider the evidence in a light most favorable to

the verdict. A guilty verdict will not be set aside if the State's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt. We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, determine the plausibility of an explanation, or weigh the evidence."

*Id.* (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 16, 693 N.W.2d 685, 693).

[¶48.] The evidence in this case does not match Kryger's assertion that his conviction was based on speculation and conjecture. Both direct and circumstantial evidence existed linking Kryger to Kirkegaard's death. Kryger's sperm cell DNA was found in Kirkegaard's vagina after he initially denied knowing Kirkegaard or having sex with her. Kirkegaard lived alone and the evidence suggested that she did not have a relationship or any prior contact with Kryger. Further, Kirkegaard returned home on the night of her death shortly after a family gathering, diminishing the likelihood that she had brought Kryger into her home from another location. Kryger admitted riding his bike during the timeframe that Kirkegaard was killed, and he was seen on the mosque video riding his bike in the immediate vicinity of Kirkegaard's home around the time of Kirkegaard's death. Three people identified Kryger in the mosque video.

[¶49.] Kirkegaard's autopsy revealed ligature marks indicating strangulation. She also had numerous other traumatic injuries, including a fractured hyoid bone and thyroid cartilage, and multiple red marks in her vagina. These injuries indicated a deliberate use of force, as well as an imminently dangerous act done with a depraved mind.

[¶50.] Kirkegaard's purse was discovered missing from her home. The day after her death, Kryger suddenly had enough money to buy an engagement ring for

his girlfriend, a cell phone, and a calling plan. After his DNA was found on the body, Kryger claimed in a phone call to Nagel that he had consensual sex with Kirkegaard. However, the injuries to Kirkegaard and the circumstances surrounding the night of Kirkegaard's death provide no explanation or possibilities as to how or why that consensual sex would have occurred.

[¶51.] In the aggregate, and in a light most favorable to the guilty verdict, the evidence is sufficient to sustain Kryger's conviction on all crimes. The State's evidence and all favorable inferences support a rational theory of guilt in this case and the jury's ability to make that determination on each of the charges. Kryger was not entitled to a judgment of acquittal and the circuit court did not err.

## Conclusion

[¶52.] The circuit court did not commit prejudicial error in any of the issues raised by Kryger, and thus, we need not address Kryger's final argument that accumulation of the court's errors warrants a new trial. The evidence in the record is sufficient to sustain Kryger's convictions on all counts. We affirm.

[¶53.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.