#29657-r-PJD
**2023 S.D. 17**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

    v.

AMANDA ROSE HERNANDEZ,                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CHARLES MIX COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BRUCE V. ANDERSON
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

SARAH L. THORNE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                          and appellant.

TIMOTHY R. WHALEN
Lake Andes, South Dakota                    Attorney for defendant
                                          and appellee.

\* \* \* \*

ARGUED
APRIL 27, 2022
REASSIGNED MARCH 3, 2023
OPINION FILED **04/12/23**

#29657

DEVANEY, Justice (on reassignment).

[¶1.]        Amanda Hernandez is charged with second-degree murder and several lesser offenses in connection with the death of her daughter, A.H.  The circuit court made a preliminary ruling that Hernandez could provide testimony from an expert witness on the capacity of a ten-year-old alleged third-party perpetrator to have killed A.H.  The expert's opinion was based in substantial part upon an analysis of the ten-year-old's prior behavior and other acts.  The State requested an intermediate appeal from this ruling, which we granted.  We reverse and remand.

## Factual and Procedural Background

[¶2.]        Shortly before 1:30 p.m. on August 14, 2019, Amanda Hernandez found her three-year-old daughter, A.H., lying unresponsive and cold to the touch in the bottom bunk of the bed in which she had been sleeping.[1]  Law enforcement officers responded and determined that A.H. was dead.[2]  Hernandez was arrested and charged by complaint on August 19, 2019, with the single count of second-degree murder in connection with A.H.'s death.  On August 28, 2019, Hernandez was indicted by a grand jury on the following counts related to A.H.'s death: one count of second-degree murder; two counts of first-degree manslaughter; and one count of aggravated assault, or in the alternative, one count of abuse of or cruelty to a minor.

1.     Because this case is before us from an intermediate appeal, the facts have not been adjudicated and are taken from the pleadings and reports contained within the record.

2.     According to the forensic pathologist who conducted A.H.'s autopsy, she had multiple injuries, including contusions, abrasions, and lacerations on her face and head; bruises on her back and abdomen; hemorrhages around her brain and eye; a fractured femur; and a lacerated liver that was the fatal injury.

-1-

[¶3.] Hernandez and A.H. had been living in the home of Sidnae Webster for around two weeks prior to A.H.'s death. Webster's children, N.M. (age 10), J.M. (age eight), and N.M. (age six) also lived in the home. Hernandez has another child, S.P., but S.P. was not staying at Webster's house the night before A.H. died and was not there at the time of A.H.'s death.

[¶4.] The night before A.H. died, it appears that Hernandez went out with her friend, Andrew Shields, and Webster was at the home with her children and A.H. through the night. Webster left sometime in the morning between 8:00 and 9:00 a.m. to run an errand and at this time Hernandez had not yet returned home. Around 10:30 a.m., Webster returned to the home, as did Hernandez and Shields. Hernandez and Shields were both intoxicated and fell asleep on the couch in the living room, and Webster went to sleep in her room. Webster's children were in her room with her, and A.H. was asleep in the bottom bunk of a bunk bed in the second bedroom. The second bedroom was accessible by separate doors from both Webster's room and the living room.

[¶5.] None of the adults or children in the home discovered that A.H. was unresponsive until Hernandez woke up and checked on her shortly before 1:30 p.m. The State and Hernandez offer different theories regarding when A.H. received the injuries that caused her death. The State contends that A.H.'s injuries occurred sometime between 11:00 a.m. and 1:00 p.m., and that Hernandez inflicted the injuries. Hernandez argues that the injuries were inflicted by a third-party perpetrator sometime between 6:30 a.m. and 9:30 a.m., which was before Hernandez returned to the house. She alleges that N.M., Webster's ten-year-old

son, inflicted the injuries upon A.H. that caused her death. Hernandez theorizes that N.M. injured A.H. while Webster was absent from the home and before Hernandez and Shields returned to the house.

[¶6.] The State and Hernandez have engaged in extensive pretrial litigation related to Hernandez's third-party perpetrator theory. Of foundational importance in this appeal are three motions filed by Hernandez on April 6, 2020. First, she filed a motion requesting access to N.M.'s Department of Social Services (DSS) records, school records, counseling records, and juvenile delinquency records and materials. Second, Hernandez filed a motion requesting a pretrial ruling on the admissibility of evidence regarding her third-party perpetrator theory that N.M. caused A.H.'s death. Third, Hernandez filed a motion requesting permission to retain a psychiatrist or psychologist as an expert witness regarding the effects of domestic violence on children.

[¶7.] In support of her motions, Hernandez advised the circuit court that N.M. had witnessed his father assaulting his mother on multiple occasions. Hernandez asserted that the requested records and reports would show that "N.M. has exhibited classic behaviors and aggression associated with" those who have been exposed to domestic violence. Hernandez explained that the testimony from an expert regarding the effects domestic violence may have on children would support her third-party perpetrator theory. She identified Dr. Trevor Stokes, Ph.D., a clinical psychologist specializing in child behavior, as her expert witness. Hernandez also identified statements N.M. made during a forensic interview showing that he was in close proximity and had the opportunity to harm A.H.

Finally, Hernandez proffered several prior acts of N.M. and argued that this evidence would show that N.M. had a motive to fatally injure A.H. and a modus operandi of reacting to others with severe aggression, all of which she claimed would be relevant as to the identity of A.H.'s killer.

[¶8.] The State resisted Hernandez's three motions, arguing that the requested records pertaining to N.M. are confidential or privileged and that the information from the proposed expert was irrelevant, unnecessary, and more prejudicial than probative. The State asserted that the expert opinion was based on improper propensity and other acts evidence and, therefore, was not admissible to support Hernandez's third-party perpetrator defense. The State further argued that because the proffered expert testimony was inadmissible, a denial of Hernandez's request for an expert would not affect her right to present a defense.

[¶9.] After hearing arguments from both parties at a hearing in May 2020, the circuit court granted Hernandez's motion requesting N.M.'s records, with the caveat that the records were to first be collected by the State and submitted to the court for an in-camera review. The court held that it would review the records to determine which are discoverable and then allow Hernandez's attorney the opportunity to inspect those records at the State's Attorney's Office and request a copy of the documents necessary for her defense.

[¶10.] The circuit court held in abeyance Hernandez's motion requesting a ruling on the admissibility of evidence related to her third-party perpetrator theory that N.M. caused A.H.'s death. Regarding the expert witness motion, the court characterized Hernandez's justification for the witness as follows:

> But if I understand your motion, I think the primary concern is you're worried that a jury would say, how could somebody so young engage in such horrible conduct? And so you want an expert to educate the jury that, you know, sometimes these things happen with young people and it's not beyond the realm of possibilities. And, in fact, depending on the nature of the abuse they suffered, sometimes it's a little more common and maybe often sometimes frequent.

The court granted Hernandez's motion for an expert witness on a limited basis, allowing the expert to provide a preliminary outline of his anticipated testimony.

[¶11.] Following receipt of Dr. Stokes's preliminary report, the State filed an objection to his proposed testimony. The State argued that the proffered testimony contained inadmissible evidence under SDCL 19-19-404(a) and (b) and "stepp[ed] outside the bounds of traditional syndrome testimony" because Dr. Stokes "tailor[ed] his opinion to N.M. specifically[.]"[3]

[¶12.] In August 2020, the circuit court signed its findings of fact and conclusions of law granting Hernandez's motion to offer third-party perpetrator evidence at trial. The court found that Hernandez's proffered third-party perpetrator evidence tended to show "who was the actual perpetrator of the criminal conduct which resulted in A.H.'s injuries and subsequent death" and would therefore potentially "provide [Hernandez] with a complete defense to the charges she faces in this matter." The court then determined that Hernandez's third-party perpetrator evidence was relevant, and its probative value was not substantially outweighed by the risk of unfair prejudice, thereby meeting the test for admissibility of third-party perpetrator evidence. The court clarified, however, that

---

3. The circuit court appointed counsel to represent N.M. after being informed that both the State and Hernandez intended to call him as a witness at trial.

it would make further rulings after Hernandez provided a list of the specific evidence she sought to admit and that it did "not make any conclusion as to the admissibility of expert testimony at this point in time in light of its prior rulings."

[¶13.]     The same day, the State filed its objection to the evidence listed in Hernandez's disclosure of the specific third-party perpetrator evidence she intended to introduce at trial. The State objected to all of the evidence listed with the exception of one incident, which it conceded was "proper third party perpetrator evidence" and which included "[e]vidence that N.M., Sidnae Webster, and Andrew Shields were in the house and had the opportunity to be alone with A.H. before and after [Hernandez] arrived home on the date A.H. died." The State argued that Hernandez's other evidence was improper propensity and other acts evidence, was privileged, was inadmissible hearsay, and/or was irrelevant and substantially more prejudicial than probative.

[¶14.]     The circuit court heard arguments from both parties regarding the State's objections at a motion hearing in September 2020. At the conclusion of the hearing, the court approved Dr. Stokes's appointment as a defense expert witness and later filed a written order allowing Hernandez's counsel and Dr. Stokes access, subject to a protective order, to N.M.'s previously requested records with the exception of some DSS documents that the court determined were irrelevant.

[¶15.]     After receiving Dr. Stokes's full report, the State moved for a *Daubert* hearing regarding the admissibility of his testimony. In the report, Dr. Stokes opined that N.M. "has a multi-factor profile of a child with a background seen in children who engage in extreme acts of aggression." While acknowledging that not

all children who share this profile engage in aggressive and violent actions, Dr. Stokes concluded it was plausible that N.M. caused A.H.'s death. Though N.M. had not seriously harmed another child previously, Dr. Stokes based his opinion on N.M.'s "accelerating pattern of repeated aggression demonstrating his capacity to seriously harm another child by violent assault[.]"

[¶16.] The State filed a separate motion to exclude Dr. Stokes's opinion in its entirety and argued in the alternative that he should only be allowed to testify about the characteristics of children who witness domestic violence. The State further argued, as it had previously, that Dr. Stokes's opinion was improper propensity evidence and based on inadmissible other acts evidence, was irrelevant, and was substantially more prejudicial than probative. The State also filed a motion requesting witness testimony to establish the factual predicates for the alleged other act evidence Hernandez offered in support of her third-party perpetrator theory so that the circuit court could determine admissibility under the applicable law.

[¶17.] The circuit court held the requested *Daubert* hearing on December 11, 2020, and heard testimony from Dr. Stokes and from the State's rebuttal witness, Sarah Flynn, M.D., a psychiatrist. The evidence established that Dr. Stokes is a highly credentialed clinical psychologist specializing in behavior analysis of children and the effects of domestic abuse and violence on children who witness it in the home. Dr. Stokes testified that his opinions in the case were, first, based on a child behavior checklist or risk assessment of N.M. and a consideration of information contained in N.M.'s records, including that he had witnessed domestic violence at

home.  Applying these factors to N.M., Dr. Stokes opined that N.M.'s history and demonstrated characteristics are consistent with the risk factors associated with the profile of children who engage in extreme forms of aggressive and violent behavior after witnessing domestic violence.

[¶18.]        The second part of Dr. Stokes's opinion was based on the pattern of conduct and specific behaviors N.M. exhibited as documented in reports from multiple sources, including school, counseling, and police reports, and from information provided by family and community members.  These behaviors included aggressive conduct and actions toward other children in N.M.'s community.  Dr. Stokes testified that N.M.'s past behavior was consistent with a child who had been exposed to domestic violence and was suffering from the effects of this exposure. Based on his assessment of these specific acts, Dr. Stokes noted that if N.M. was upset or under duress, his emotions accelerated quickly into violent assaultive behaviors.  Considering the totality of the circumstances, Dr. Stokes opined that although he could not determine whether N.M. had in fact beaten and killed A.H., "it is plausible" that he has the capacity to do so because he has engaged in "strong, aggressive, and violent behavior" that is "consistent with a child who could cause serious harm to another child."

[¶19.]        The State's expert, Dr. Flynn, reviewed Dr. Stokes's report, listened to his testimony, and critiqued his methodology and his application of the information he received about N.M. to draw his conclusions.  The parties submitted post-hearing briefs summarizing their positions.  On March 10, 2021, the circuit court held a further hearing at which it ruled on the State's *Daubert* motion and the issues

regarding the admissibility of Dr. Stokes's opinion and its foundational facts and data. Specifically, the court ruled that Dr. Stokes's opinion was sufficiently relevant and reliable under the *Daubert* standards and that Dr. Stokes could testify as to his opinion at trial, within limits. The court reasoned that because N.M. was only ten years old, a jury may not believe that such a young child could injure another child to the extent of causing death and that Dr. Stokes's opinion would provide a basis for the jury to consider all the evidence associated with A.H.'s death and whether N.M.'s behavior made him a viable third-party perpetrator.

[¶20.] In May 2021, the circuit court filed its findings of fact and conclusions of law denying Hernandez's request to admit direct evidence of N.M.'s other acts, but allowing admission of Dr. Stokes's opinion testimony. In its conclusions of law, the court stated:

> 50. This court has carefully considered the Defendant's request to present some of [N.M.'s] prior acts as direct evidence in her case in chief as independent evidence in support of her third-party perpetrator defense as well as foundational testimony to support the opinions of Dr. Stokes. The [c]ourt finds some of these acts relevant to prove intent, opportunity, plan, identity and most importantly the motive of a 10 year old. However, this court finds that presentation of such direct evidence is outweighed by the danger of unfair prejudice, confusion of the issues, undue delay and could mislead the jury.[4] [SDCL] 19-19-403. For these reasons the [c]ourt has determined to exclude such direct evidence. Nonetheless, the opinion of Dr. Stokes that a child such as N.M., based upon his behavioral history, is capable of committing

---

4. Although not at issue in this appeal, the circuit court incorrectly stated the standard for excluding relevant evidence under SDCL 19-19-403. That statute provides in pertinent part that "[t]he court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice[.]" *Id.* (emphasis added).

violent homicidal acts is highly probative evidence in the context of this case and [Hernandez's] third party perpetrator defense.

51. Stokes'[s] opinions are relevant and admission of the factual basis for [the] same as part of his testimony will not result in a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

52. In this case identity as to the perpetrator of the events which lead to A.H.'s death is an issue. It is Stokes'[s] opinion that N.M.'s other acts, conduct and behavior, and his style and pattern of conduct and behavior as well as his method of operating or modus operandi will assist the jury in identifying N.M. as a possible perpetrator of the crimes with which [Hernandez] is charged.

53. After engaging in the two part balancing test as provided by the governing law, N.M.'s other acts, conduct and behavior are admissible as part of Stokes['s] foundational testimony at the trial of the above matter.

[¶21.]    The circuit court also filed a written order denying the State's motion to exclude Dr. Stokes's testimony, clarifying that the prior acts Dr. Stokes could testify about "include but are not limited to" the following:

- Incident when N.M. was in Kindergarten he stole toys and cut another student's hair
- N.M. poked another child in the neck with a pencil
- N.M. threw food at lunch
- N.M. engaged in "rough play and fighting" with other boys during recess
- N.M. threw "classroom materials" at other students
- N.M. witnessed domestic violence in his home . . .
- N.M. threw an apple at a male teacher and threatened to kill teachers, police, and himself while upset
- N.M. plays video games the defense alleges are violent, such as Mortal Kombat
- N.M. played a "killing game" at recess with peers
- N.M. pulled his younger sisters, J.M. and N.M. into deep water at the river

- N.M. allegedly threw his younger sister, J.M. to the ground, kicked her; stomped on her head, stomach, and chest; and punched her repeatedly in the head and body
- N.M. elbowed a teacher
- N.M. and a group of peers tripped and hit other children

[¶22.] Ultimately, the court ruled that "Dr. Stokes shall be permitted to testify to his full report and will further be allowed to provide a summary of all of the defendant's proffered other acts to the jury" pursuant to SDCL 19-19-703 (Rule 703). The court also denied the State's motion requesting that the defense be required to establish the factual predicates for the alleged other acts before ruling on their admissibility and ruled that any challenge by the State to the veracity of the other acts must be brought outside the presence of the jury *after* Dr. Stokes testifies.

[¶23.] The State petitioned this Court for an intermediate appeal from the circuit court's pretrial order, and we granted the petition. The State raises two issues, which we restate as follows:

1. Whether the circuit court misapplied the rules governing third-party perpetrator evidence when considering the admissibility of proffered expert witness testimony.

2. Whether the circuit court abused its discretion by allowing expert witness testimony to serve as a conduit for otherwise inadmissible propensity and other acts evidence.

**Standard of Review**

[¶24.] "Decisions to admit or deny evidence are reviewed under the abuse of discretion standard." *State v. Packed*, 2007 S.D. 75, ¶ 17, 736 N.W.2d 851, 856. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or

unreasonable.'" *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109 (citation omitted). "We afford broad discretion to the court in deciding whether to admit or exclude evidence." *Packed*, 2007 S.D. 75, ¶ 24, 736 N.W.2d at 859 (citations omitted). However, "[w]hen a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion." *State v. Guthrie*, 2001 S.D. 61, ¶ 30, 627 N.W.2d 401, 415 (citation omitted).

### Analysis and Decision

> **1. Whether the circuit court misapplied the rules governing third-party perpetrator evidence when considering the admissibility of proffered expert witness testimony.**

[¶25.]      The State argues that the circuit court misinterpreted this Court's third-party perpetrator cases when it analyzed the admissibility of Hernandez's third-party perpetrator evidence because the court did not perform what the State deems to be the necessary three-part analysis. The State asserts that in addition to examining the relevance of the proffered evidence and conducting a balancing test under SDCL 19-19-403 (Rule 403), the court was required to determine whether there is a connection between the alleged third-party perpetrator and the crime at issue by considering the third party's proximity to the crime and opportunity and motive to commit the crime. Hernandez responds that the circuit court applied the proper legal standard by examining whether the evidence is relevant and whether the evidence survives the Rule 403 balancing test. Hernandez maintains that there is no heightened standard beyond this that must be met in order to admit third-party perpetrator evidence.

[¶26.]    When considering the admissibility of Hernandez's proffered third-party perpetrator evidence and the State's opposition thereto, the circuit court relied primarily on *State v. Larson*, in which this Court emphasized that "[t]he general rule requires the court to balance the importance of the evidence against the state's interest in exclusion." 512 N.W.2d 732, 739 (S.D. 1994). In *Larson*, the Court concluded that this standard, and not one stricter, was appropriate. The *Larson* Court explained:

> The state asserts that, to be admissible under *State v. Braddock*, 452 N.W.2d 785 (S.D. 1990), the evidence must establish that the third person: (1) was in the proximity of the crime scene; (2) had a motive to commit the crime; and (3) had the opportunity to commit the crime. This Court does not read *Braddock* to require this heightened foundation. *Braddock* simply reinforced [*State v. Luna*, 378 N.W.2d 229 (S.D. 1985)]'s probative versus prejudicial balancing requirement and simply noted that "evidence that a third person in the proximity of a crime had the motive and opportunity to commit the crime is [of course] admissible."

*Id.* (second alteration in original). Although this Court in *Davi v. Class*, 2000 S.D. 30, ¶ 36, 609 N.W.2d 107, 115, seemed to require a consideration of these three factors, we later clarified our third-party perpetrator law in *Packed*, stating:

> [W]e must emphasize that there is no special rule in South Dakota dealing solely with third-party perpetrator evidence. Relevant evidence is admissible; irrelevant evidence is inadmissible, subject to the considerations of SDCL [19-19-403]. SDCL [19-19-402]. Labelling an offer "third-party perpetrator" evidence will not automatically exclude it. When third-party perpetrator evidence is challenged as unfairly prejudicial, confusing, or misleading, trial courts are required to apply, on the record, the probative versus prejudicial balancing test of SDCL [19-19-403] in deciding to admit or exclude such evidence.

2007 S.D. 75, ¶ 22, 736 N.W.2d at 858–59.

[¶27.] We now reiterate that the proper test for admissibility of third-party perpetrator evidence is: (1) whether the evidence is relevant under SDCL 19-19-401, and (2) whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice or the other considerations listed in SDCL 19-19-403. Within the relevance analysis, a circuit court may consider the alleged third-party perpetrator's opportunity to commit the crime, proximity to the crime, motive to commit the crime or lack thereof, or any other pertinent factors. And in conducting the Rule 403 balancing analysis, courts should take into consideration judicial efficiency concerns, cumulative evidence issues, and the avoidance of minitrials before the jury. However, as noted in *Larson*, there is no additional multi-factored test that must be met for admissibility of third-party perpetrator evidence. 512 N.W.2d at 739.

[¶28.] While the above sets forth the proper test for admissibility of third-party perpetrator evidence, the question whether the circuit court erred in admitting third-party perpetrator evidence here involves a consideration of much more than the admissibility of a simple third-party perpetrator defense theory that N.M. killed A.H. because he was in close proximity to A.H. and had the opportunity to harm her. Hernandez's proffered third-party perpetrator evidence—Dr. Stokes's opinion that N.M. is capable of committing murder—centers in large part upon other acts evidence derived from prior incidents involving N.M. and therefore implicates other rules of evidence. As such, the question whether Dr. Stokes's opinion testimony is admissible third-party perpetrator evidence is inextricably

related to the second issue the State raises in this appeal, and we address that issue

below.

> **2. Whether the circuit court abused its discretion by allowing expert witness testimony to serve as a conduit for otherwise inadmissible propensity and other acts evidence.**

[¶29.]        The State claims that the circuit court erred in admitting Dr. Stokes's

opinion because his testimony is being offered to prove that "N.M. likely acted

aggressively toward A.H. on the day she died" in light of evidence that N.M.

previously acted aggressively.  The State further asserts that the court erred in

allowing Dr. Stokes to testify about N.M.'s other acts because Dr. Stokes is

impermissibly serving as a conduit for inadmissible propensity evidence.  In

response, Hernandez asserts that the court properly admitted Dr. Stokes's opinion

that N.M. has the capacity to commit the crime at issue because of his

demonstrated pattern of behavior.  According to Hernandez, such testimony is

admissible under SDCL 19-19-404(b) (Rule 404(b)) as evidence of other acts to prove

"a modus operandi, style and pattern of behavior for N.M." and to show "his identity

as the perpetrator of the crimes against A.H."

[¶30.]        At the outset, it is important to note that Dr. Stokes's opinion that it is

plausible N.M. caused A.H.'s death is unlike the profile expert testimony this Court

has considered in other cases cited by the parties and the circuit court here.  *See*

*State v. Huber*, 2010 S.D. 63, 789 N.W.2d 283; *Guthrie*, 2001 S.D. 61, 627 N.W.2d

401.  His opinion is not centered on N.M. fitting within a particular profile.  In fact,

Dr. Stokes notes that "most children whom we might identify using such profiling

information do not conduct ongoing violent actions[.]"  Dr. Stokes then discounts the

relevancy of his assessment that N.M. meets the profile seen in children who engage in acts of aggression by further explaining in his report that for N.M. "[t]o be considered an *aggressive perpetrator*[,] . . . there must be an established and documented pattern of his aggressive behavior across time and circumstances." (Emphasis added.) His opinion therefore rests on the proffered evidence of N.M.'s prior acts.

[¶31.]      Although Hernandez sought to admit direct evidence of N.M.'s other acts and the circuit court found that some of the acts (without specifying which ones) are relevant on several grounds under Rule 404(b), the court ultimately denied Hernandez's request in its entirety. In so ruling, the court determined that the probative value of these acts was substantially outweighed by Rule 403 concerns, particularly the concern over the potential for minitrials on each act.[5] The court nevertheless ruled that the details of all the proffered other acts could be admitted through Dr. Stokes's testimony under Rule 703.[6] Without explaining why

---

5.    In denying the admission of direct evidence of N.M.'s other acts, the circuit court's findings and conclusions do not contain an analysis of whether each of N.M.'s proffered other acts would be independently relevant under Rule 404(b) for a purpose other than showing N.M.'s propensity for aggression, nor do the court's findings and conclusions include the requisite balancing under Rule 403 for each act. *See State v. Patterson*, 2017 S.D. 64, 904 N.W.2d 43 (addressing the admissibility of each alleged other act of an alleged third-party perpetrator); *United States v. White Plume*, 847 F.3d 624 (8th Cir. 2017) (same). Whether the court's ruling as to the relevance of N.M.'s other acts and the potential for unfair prejudice if they were admitted via direct evidence was erroneous is not before us in this appeal.

6.    SDCL 19-19-703 provides:

          An expert may base an opinion on facts or data in the case that
          the expert has been made aware of or personally observed. If
                                              (continued . . .)

the prejudicial analysis would produce a different result under this rule, the court

determined that the probative value of these very same acts, when offered in

support of Dr. Stokes's opinion, is not substantially outweighed by the danger of

their prejudicial effect.[7]

[¶32.]	The rules of evidence, including those which govern the admissibility of

expert opinions, are designed to avoid placing misleading, confusing, unreliable, or

inaccurate evidence before a jury.  At the forefront of the evidentiary issues

surrounding Dr. Stokes's testimony are SDCL 19-19-404(a) and (b).  These rules

prohibit propensity evidence in the form of evidence of character traits or other acts

unless the evidence is being used for a non-propensity purpose.  Evidence which

endorses the premise that a person acted in a particular way because of an alleged

trait or history is commonly known as propensity evidence.  SDCL 19-19-404(a)(1)

provides that "[e]vidence of a person's character or character trait is not admissible

to prove that on a particular occasion the person acted in accordance with the

---

(. . . continued)

> experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts of data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

7.	To the extent the circuit court determined the Rule 403 concerns were lessened by allowing Dr. Stokes to relate hearsay evidence, such a determination is problematic.  The party opposing expert testimony is entitled to challenge the veracity of the evidence underlying the expert opinion and allowing the other acts to be admitted via an expert is just as likely to prompt a series of collateral minitrials and result in undue delay as would the admission of direct evidence of other acts.

character or trait."[8] SDCL 19-19-404(b)(1) similarly provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Other acts and propensity evidence "cannot be used to prove conduct through an inference about the [individual]'s character, i.e., a general propensity to commit assaults[.]" *State v. Lassiter*, 2005 S.D. 8, ¶ 24, 692 N.W.2d 171, 179.

[¶33.] Dr. Stokes's opinion that N.M. has the capacity to commit the crime at issue skirts the requirements for admissibility under these evidentiary rules. His opinion testimony is pure propensity evidence of the sort that is expressly forbidden under SDCL 19-19-404. Dr. Stokes relies on N.M.'s history, character traits, and particularly, his prior acts, to draw the conclusion that N.M. would be capable of fatally injuring A.H. Thus, his opinion is, in essence, that because N.M. has previously acted aggressively in certain circumstances, it is plausible that he acted in conformity with this previous conduct by killing A.H.

[¶34.] In rejecting the State's argument that Dr. Stokes's testimony falls within the prohibition in SDCL 19-19-404 against admitting propensity evidence, the circuit court's findings and conclusions suggest the court determined that Dr. Stokes's opinion regarding N.M.'s *capacity* to seriously harm another child is admissible because it is something different than his *propensity* to do so. However,

---

8. Although there are exceptions under SDCL 19-19-404(a) that allow for the admission of a character trait, these exceptions relate to pertinent traits of a defendant or victim or a witness's reputation for truthfulness, neither of which are applicable to Dr. Stokes's proffered testimony here. *See* SDCL 19-19-404(a)(2), (3).

it is apparent from a careful examination of the manner in which Dr. Stokes used this term that capacity was a euphemism for propensity.

[¶35.] In one of its findings, the circuit court referred to both N.M.'s "mental and physical capacity to beat and kill A.H.[,]" but in other findings, the court referred to Dr. Stokes's opinion as relating to N.M.'s *mental* capacity. The parties' arguments on appeal similarly refer to Dr. Stokes's opinion as to N.M.'s *mental* capacity. But in his written opinion, Dr. Stokes refers only to "capacity[,]" not *mental* capacity. During cross-examination at the *Daubert* hearing, the State asked him what he meant by this term. In particular, the State asked whether he was simply referring to the "ability to do something." Dr. Stokes agreed with this characterization. But when further pressed about whether he was referring to N.M.'s *physical* capacity to harm A.H. to the point of death, Dr. Stokes acknowledged he could not opine as to the degree of force necessary to cause death.[9]

[¶36.] Although the State did not ask Dr. Stokes whether or in what sense he was referring to N.M.'s *mental* capacity, in his written opinion, Dr. Stokes stated that N.M. has the "capacity to seriously harm another child using violent assault, *even if without understanding or responding to the true safety implications of that assault.*" (Emphasis added.) It thus appears that he is not using the term "capacity" as it is generally used to define a person's mental capacity in criminal

---

9.    At the hearing, in an effort to clarify the purpose for offering Dr. Stokes's opinion, defense counsel represented to the court that forensic pathologist Dr. Kenneth Snell had already opined that a ten-year-old was physically capable of inflicting the injuries that resulted in A.H.'s death. Thus, it does not appear that Hernandez is attempting to elicit an opinion from Dr. Stokes on N.M.'s physical capabilities.

proceedings. *See Black's Law Dictionary* (11th ed. 2019) (defining "criminal capacity" under the broader term "capacity" as the "mental ability that a person must possess to be held accountable for a crime; the ability to understand right from wrong").[10] Instead, Dr. Stokes's use of the term "capacity" is just another way of saying that N.M.'s prior acts and behavior show that he has the propensity to commit acts of extreme aggression.

[¶37.] At the post-*Daubert* hearing when the circuit court heard oral arguments from the parties, the court seemed to have acknowledged, despite its later adoption of Hernandez's proposed findings stating otherwise, that Dr. Stokes's testimony could be construed as propensity evidence. Nevertheless, the court concluded that Dr. Stokes's testimony was admissible for other purposes under Rule 404(b).

[¶38.] There are multiple problems with the circuit court's determination that Dr. Stokes's testimony was admissible for purposes other than propensity. First, there are notable inconsistencies in the court's findings and conclusions as to the basis on which it found Dr. Stokes's testimony to be admissible under Rule 404(b). In its written findings and conclusions with respect to the relevance of Dr.

---

10. In the event Dr. Stokes's use of the term "capacity" was meant to refer to N.M.'s mental culpability such that he could be held legally accountable for committing a homicide, the circuit court's assessment of the relevance of such testimony was erroneous. As the State has correctly noted, whether an alleged third-party perpetrator could be held legally accountable is not the issue the jury must ultimately decide. *See State v. Reay*, 2009 S.D. 10, ¶ 37, 762 N.W.2d 356, 367 (affirming the refusal of a defendant's proposed jury instruction relating to the mental culpability of an alleged third-party perpetrator; noting that even if the alleged third-party perpetrator had been the killer, the jury did not need to find the third-party perpetrator legally responsible in order to find the defendant not guilty).

Stokes's opinion, the court noted that the identity of A.H.'s killer is at issue and determined that Dr. Stokes's opinion that N.M.'s "style and pattern of conduct and behavior as well as his method of operating or modus operandi will assist the jury in identifying [him] as a possible perpetrator[.]" However, in the court's order denying the State's motion to exclude testimony from Dr. Stokes on these other acts, the court referred only to admitting them to show N.M.'s motive. Notably, on appeal, Hernandez refers only to identity, rather than motive, when urging this Court to affirm the circuit court's ruling.

[¶39.] In addition to these inconsistencies, the circuit court did not properly apply the established standards for determining whether other acts may be admitted under Rule 404(b) to show identity or motive. In considering whether other acts can be admitted to show modus operandi, this Court "generally will look for common features that make it highly probable that the unknown offender and the accused are the same person." *Lassiter*, 2005 S.D. 8, ¶ 18, 692 N.W.2d at 177 (citing *State v. Wright*, 1999 S.D. 50, ¶ 18, 593 N.W.2d 792, 800 ("unusual or distinctive"); McCormick on Evidence § 190 at 449 (Edward W. Cleary ed., 2d ed. 1972) ("so nearly identical in method as to earmark them as the handiwork of the accused")). Further, "we have never strayed from the requirement that in cases where prior acts are offered to prove identity, the acts must be unusual or distinctive." *Id.* ¶ 16, 692 N.W.2d at 176.

[¶40.] A review of Dr. Stokes's characterization of N.M.'s acts reveals that although he labels N.M.'s pattern of behavior as distinct, his description of N.M.'s generally aggressive conduct is neither unusual nor distinctive. Rather, the acts

are quite the opposite. Dr. Stokes refers to N.M.'s acts as being consistent with the acts of other children who have witnessed domestic abuse and who then develop a pattern of increasingly aggressive behavior when under duress or not getting their way. But he did not offer any testimony suggesting that the identified other acts of aggression by N.M. are so unusual or distinctive or that they resulted in similar injuries to those inflicted upon A.H. such that it is highly probable that the offender is N.M.[11]

[¶41.] In its oral ruling, the circuit court acknowledged a critical problem when considering whether to admit evidence of N.M.'s other acts for identity. The court observed that this case is unlike *Lassiter* where the victim was alive and could testify as to what happened so that there could be a comparison of whether the other acts were similar to the charged offense. Here, however, as noted by the court, the defense theory that N.M.'s prior acts were similar to what happened to A.H. would require the court "to speculate on what happened." In fact, the court, in its oral comments, seems to have rejected the notion that N.M.'s other acts could be admissible through Dr. Stokes on the issue of identity. Yet, this ground was ultimately included in the court's later written findings and conclusions. Based on the record, to the extent the court determined Dr. Stokes's testimony regarding N.M.'s pattern of aggression is relevant to show a modus operandi, the court erred.

---

11. The other acts relied on by Dr. Stokes include N.M. cutting another student's hair, poking a child with a pencil, throwing food at lunch, throwing other items in the classroom, rough play at school, elbowing a teacher, pulling his sisters into deep water while at the river, and kicking, punching, or stomping on his sister. There was no evidence in the record suggesting that these other acts resulted in injuries even close to the magnitude of those inflicted on A.H.

[¶42.]     There is a similar problem with the circuit court's determination that Dr. Stokes's opinion testimony is relevant to show motive. For this ruling, the court relied on *Lassiter's* discussion of admitting other acts evidence to show the existence of a motive such as "hostility, antipathy, hatred, or jealousy" when there is a relationship between the victims. *See* 2005 S.D. 8, ¶ 22, 692 N.W.2d at 178. Although the court observed that some of N.M.'s prior acts involved "girls who have been subjected to some form of violence by N.M., who are either living in his home . . . or children of mother's friends or acquaintances[,]" the court never identified *a motive* that would prompt N.M. to violently attack A.H. Unlike the domestic relationship cases involving a breakup or some other precipitating factor that is common between similar victims, *see e.g.*, *State v. Evans*, 2021 S.D. 12, 956 N.W.2d 68, there is no evidence as to what transpired between N.M. and three-year-old A.H. prior to her being injured to the point of death such that a comparison could be made to what might have motivated him to act aggressively on prior occasions.

[¶43.]     The only evidence in the record on this point is from N.M.'s forensic interview in which he related hearing A.H. crying between 6:00 and 7:00 a.m. and that he comforted her by telling her that her mom would soon be home. He stated that he then went back to the bedroom where he had been sleeping and had no further contact with A.H. In addition to the lack of an identified motive with respect to A.H., there is no reference in Dr. Stokes's report to a common "motive" behind N.M.'s prior acts of aggression.[12] For these reasons and based on the

---

12.     Rather than identifying a consistent motive prompting N.M. to act aggressively, Dr. Stokes more generally refers to N.M.'s character traits of

(continued . . .)

evidence in the record, the circuit court's determination that Dr. Stokes's opinion was relevant under Rule 404(b) to show motive was also erroneous.

[¶44.] Even if some of N.M.'s other acts could potentially be admissible for a purpose other than propensity under Rule 404(b), this would not make Dr. Stokes's *opinions* about N.M.'s propensity to harm A.H. admissible. Hernandez has cited no authority from this Court that would allow other acts like those proffered here to be admitted through the testimony of an expert witness. Moreover, although the circuit court cited Rule 703 and this Court's analysis of the admissibility of expert opinion testimony resting on a profile and a comparison to underlying acts in *Huber*, 2010 S.D. 63, ¶ 23, 789 N.W.2d at 290 and *Guthrie*, 2001 S.D. 61, ¶ 42, 627 N.W.2d at 419, the court's reliance on these cases and Rule 703 to support its ruling was misplaced.

[¶45.] While the court correctly observed that other acts of a party are often "relied upon by expert witnesses to render their opinions regarding behaviors of individuals[,]" neither *Huber* nor *Guthrie* involved issues relating to opinions or the type of underlying facts that could be construed as character or propensity evidence implicating Rule 404(a) and (b).[13] Rather, in both cases, the issues on appeal

---

(. . . continued)

being irritable or disrespectful to those in authority and to scenarios where he is not getting his way. The proffered evidence relating to the more extreme alleged acts toward his sister refers to N.M. being angry over a game they were playing.

13. When arguing for the admission of Dr. Stokes's testimony, defense counsel disavowed the circuit court's characterization of the proffered testimony as an opinion that N.M. met a "profile" and insisted that this would be a "complete misunderstanding" of Dr. Stokes's testimony. Defense counsel then directed

(continued . . .)

pertained to whether the expert testimony lacked an adequate foundation under *Daubert's* reliability standards and the rules of evidence governing expert testimony, and whether the expert's testimony improperly invaded the province of the jury. Neither case involved the question whether the expert's opinion itself or the underlying acts on which the opinion rests were inadmissible under other rules of evidence. And although *Huber* and *Guthrie* both refer to the ability of an expert, under Rule 703 (formerly SDCL 19-15-3), to rely on facts or data that need not be admissible in evidence, these cases do not support the notion that an expert can serve as a conduit of otherwise inadmissible propensity evidence.[14]

_____

(. . . continued)

> the court to the explanation in Dr. Stokes's report that N.M.'s profile is simply a "risk assessment tool" and urged the court to focus instead on Dr. Stokes's testimony regarding N.M.'s pattern of behavior demonstrated by his prior acts.

14. In *Williams v. Illinois*, a case cited by the State in its brief to this Court, the United States Supreme Court addressed the concern that an expert improperly served as a conduit for inadmissible evidence. 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012). The issues raised with respect to the expert testimony in *Williams* do not align with those raised in conjunction with Dr. Stokes's testimony, but the following analysis is nevertheless instructive when considering the State's conduit argument:

> First, trial courts can screen out experts who would act as mere conduits for [inadmissible evidence] by strictly enforcing the requirement that experts display some genuine "scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." Second, experts are generally precluded from disclosing inadmissible evidence to a jury. Third, if such evidence is disclosed, the trial judges may and, under most circumstances, must, instruct the jury that out-of-court statements cannot be accepted for their truth, and that an expert's opinion is only as good as the independent evidence that establishes its underlying premises. And fourth, if the [movant] cannot muster any

(continued . . .)

[¶46.]     While Dr. Stokes has specialized knowledge regarding the behaviors of children, like N.M., who have been exposed to domestic violence, the opinion he offers and the underlying acts on which his opinion hinges fall within a specific category of evidence that must be scrutinized under Rule 404(a) and (b).  Because we have determined that his opinion itself is not admissible under these rules, there is no avenue under Rule 703 by which Dr. Stokes can testify about N.M.'s other acts.

[¶47.]     Because the circuit court erroneously applied Rule 404(a) and (b) and Rule 703 in allowing the admission of Dr. Stokes's proffered testimony, the court abused its discretion.  Therefore, we reverse the court's ruling and remand for further proceedings.

[¶48.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.

---

(. . . continued)

> independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact.

*Id.* at 80–81, 132 S. Ct. at 2241 (internal citations omitted).  Unlike in *Williams*, where the expert testimony was ultimately admitted, the scenario presented with Dr. Stokes's proffered expert testimony is not one involving an otherwise admissible expert opinion for which any concerns regarding the disclosure of facts on which the opinion rests could simply be addressed with a limiting instruction.